Gary GILBERT, Plaintiff,

v.

David FELD, Zeev Shenkman, Richard Tompkins, the law firm of Fox, Differ, Callahan, Ulrich & O'Hara, a partnership, and Edmund Justice, Defendants.

Civ. No. 91–3804.

United States District Court,
E.D. Pennsylvania.

Dec. 14, 1993.

### OPINION

LOUIS H. POLLAK, District Judge.

This case arises out of plaintiff Gary Gilbert's sale of a parcel of land located in King of Prussia, Pennsylvania. Because the defendant purchasers and their attorneys believed that Gilbert had committed criminal fraud in connection with that sale, criminal charges were brought against Gilbert. Those charges were subsequently dismissed. In the instant civil action, Gilbert alleges that various defendants are liable for: (1) malicious prosecution; (2) abuse of the criminal process; (3) false arrest and imprisonment; (4) intentional infliction of emotional distress; (5) civil conspiracy; and (6) civil rights violations under 42 U.S.C. § 1983. All of the defendants have filed for motions for summary judgment. For the reasons given below, the several summary judgment motions are granted in all respects and plaintiff's case is dismissed in its entirety.

Part I of this opinion describes the factual background and procedural history of this case. Part II provides the standard of review. Parts III through VIII analyze whether on the undisputed facts, the motions for summary judgment should be granted.

### I.

#### Factual Background and Procedural History

At issue today are motions for summary judgment filed by the various defendants; consequently, the following factual recital accepts as true all evidence proffered by the nonmovant plaintiff, with all reasonable inferences drawn in his favor.

Defendant David Feld is the President and majority shareholder of Feld & Sons, Inc., a retail men's clothing store chain that trades as Today's Man. Defendant Zeev Shenkman served as Vice President and Chief Financial Officer of Today's Man under Feld's immediate supervision from July 1986 through September 1987.

In 1986, Today's Man—in search of a desirable location on which to build a retail store—became interested in a site comprised of six contiguous lots along the DeKalb Pike in King of Prussia, Pennsylvania. Feld authorized Shenkman to purchase these lots for development as a retail outlet.

In July 1986, Feld retained the law firm of Fox, Differ, Callahan, Ulrich & O'Hara ("defendant law firm") to provide counsel about zoning issues relating to development of the lots.[1] One month later, Shenkman, on behalf of Today's Man, agreed to purchase five of the lots from their owner, Robert Euler, at a

---

1. The lots required a zoning change before Today's Man could develop them for commercial use.

combined price of $1,600,000.[2] Shenkman could not purchase from Euler the sixth lot, adjacent to Euler's property and located at 115 West Dekalb Pike, because Euler did not own that lot.

In an effort to purchase the 115 West Dekalb Pike lot, Shenkman retained a real estate broker, John D. McAllister, Jr. McAllister consulted the Philadelphia Real Estate Directory, which listed Gilbert as the sole owner of the property at 115 West DeKalb. *See* Defendants' App. III, Ex. R at 1024. McAllister did not check documentary sources such as tax maps or deed records to determine whether Gilbert was actually the owner of the lot or whether anyone else also might have an ownership interest in the lot. In fact, Gilbert's grandmother, Edith Suny, had a fifty percent interest in the lot; that interest had been established approximately a year before by a deed, dated August 20, 1985 and recorded in or about November 1985, in which Gilbert had transferred title to the property at 115 West DeKalb Pike from Gilbert alone to Gilbert and Suny.[3]

Contemporaneously with McAllister's determination, on the basis of the listing in the Philadelphia Real Estate Directory, that Gilbert was sole owner of the lot, Fox, Differ— the defendant law firm—reached the same conclusion on the basis of its own investigation. Paul Callahan, a partner in the firm, instructed Richard Tompkins, an associate in the firm, to go to the Montgomery County Courthouse to get a copy of the index to the tax map. The index listed Gilbert as the owner of the lot at 115 West DeKalb.

In August or September of 1986, McAllister approached Gilbert with the intent of purchasing the 115 West DeKalb lot for Today's Man. McAllister informed Gilbert that Today's Man had purchased the five adjacent lots and asked whether Gilbert was willing to sell the 115 West DeKalb lot. Gilbert requested information concerning the price paid for Euler's property and, after receiving such information, indicated that he wanted $520,000 for his property—$200,000 more than had been paid for each of the other pieces of property. *See* Plaintiff's App. II, Ex. P at 483. Thereafter, McAllister and Gilbert engaged in a series of discussions regarding the purchase of the 115 West DeKalb lot. During these initial discussions, McAllister did not question Gilbert about his ownership of the lot or his authority to sell the premises, and Gilbert never explicitly claimed to be its sole owner. Conversely, Gilbert never intimated that anyone else had an ownership interest in the lot; according to Gilbert, he felt that the existence of a co-owner was "not an issue," so he "never brought it up." Defendants' App. IV, Exh. S at 1390.

At an early-morning meeting on October 31, 1986 at Michael's Restaurant in the Valley Forge Shopping Center, attended by, among others; McAllister, Gilbert, and Shenkman, Gilbert agreed to sell the lot to Today's Man for $454,000—that is, $66,000 less than Gilbert had originally asked. Again, during this meeting, no one asked Gilbert about his ownership of the lot or his authority to sell it, and Gilbert did not volunteer the information that his grandmother co-owned the lot. Shenkman instructed McAllister to prepare an Agreement of Sale.[4]

**2.** The agreement with Euler was not consummated until September 16, 1987.

**3.** A corporation that Gilbert had established and run at the premises, to which Suny had loaned $140,000, was failing at the time that Gilbert transferred ownership of the lot from himself to Suny and himself. Gilbert apparently conveyed the property to Suny because of the debt to her, in order to protect her financially. A bankruptcy petition was filed on behalf of the corporation on or about November 1, 1985. *See* Defendants' App. II, Ex. P. at 755.

**4.** According to Gilbert, sometime in the late afternoon of October 31, 1986, when McAllister was preparing the Agreement of Sale, McAllister telephoned Gilbert and informed him that McAllister knew that there were two people listed on the deed or title. In response, Gilbert allegedly revealed that the other person, Edith Suny, was his grandmother. *See* Plaintiff's App. II, Ex. P at 491–92. However, McAllister denies that such a conversation took place. According to McAllister, when drafting the Agreement of Sale, he did not know that Gilbert's grandmother was a co-owner, and, if he had, he surely would have included her name on the Agreement of Sale. *See* Plaintiff's App. II, Ex. O. This dispute is not material to the resolution of the motions for summary judgment because Gilbert does not allege that McAllister told Shenkman or any of the other defendants about the co-ownership before Gilbert signed the Agreement of Sale.

The Agreement of Sale prepared by McAllister listed "Gary M. Gilbert" as "Seller," and "David Feld, or his Nominee, c/o Today's Man" as "Purchaser." Plaintiff's App. II, Ex. T.[5] The name of Gilbert's grandmother, Edith Suny, did not appear in the agreement at all, and Gilbert did not raise any question about that omission with McAllister or others. The Agreement provided two signature lines for the "Seller" and one for the "Purchaser."[6] The Agreement of Sale provided for, among other things, a refundable $10,000 purchase deposit to be held in escrow until settlement on the property. At Gilbert's direction, his attorney, Michael Reed, prepared an Endorsement that made the $10,000 deposit non-refundable and payable immediately to Gilbert. After Shenkman orally approved the Endorsement later in the day of October 31, 1986, McAllister presented the Agreement of Sale and the Endorsement to Gilbert. Gilbert reviewed the documents and signed on one of the seller lines, leaving the other line blank. Soon after, Feld also signed the Agreement. Both documents listed Gilbert as the seller, but neither expressly stated that Gilbert was the sole owner of the lot. Gilbert did not mention his grandmother's interest in the property. Settlement for the sale was to be made on or before February 27, 1987. After Feld signed the documents, Today's Man forwarded a $10,000 check to Gilbert.

Shortly after the Agreement of Sale was signed, Callahan applied for a title report on the Gilbert property. He received the report in early December 1986. The report indicated that Edith Suny co-owned the premises.

Callahan mailed copies of the report to Shenkman,[7] McAllister, and Douglas Coopersmith of Astor, Weiss & Newman.[8]

After McAllister received a copy of the title report, he contacted Gilbert in an effort to obtain Suny's assent to the sale of the property. Gilbert informed McAllister that he did not anticipate a problem getting Suny to agree to the sale (an assurance which he later repeated on several occasions), and requested that McAllister prepare an endorsement with Suny's name on it. See Defendant's App., Vol II, Ex. P, at 784–85; Defendant's App., Vol II, Ex. R, at 1046–47, 1064–67. On January 5, 1987, McAllister sent Gilbert an endorsement of the Agreement of Sale for Suny's signature. Gilbert left the endorsement with Suny for her consideration, but it was never signed.

In early February of 1987, Feld extended the Agreement of Sale for six months (from February 1987 to August 1987) by depositing $10,000 in an escrow account pursuant to paragraph 29 of the Agreement of Sale. On February 11, 1987, McAllister, having been informed by Gilbert that Gilbert did not know if he could locate the Suny endorsement, sent Gilbert another endorsement for Suny to sign and a letter stating that Feld had paid an additional $10,000 to extend the agreement. In May 1987, Suny told McAllister that she would not sign the Agreement of Sale.[9]

In mid-July 1987, Shenkman told Gilbert that he had "committed a criminal violation," Plaintiff's App. III, Ex. DD at 96, and that if Suny did not sign the agreement by the end

---

5. Feld apparently purchased the property in his own name in order to lease it to Today's Man.

6. The Agreement of Sale incorrectly listed McAllister as Gilbert's agent; in fact, McAllister was the agent for the purchaser.

7. There is a conflict in the record with respect to when Shenkman learned that Suny co-owned the lot. Shenkman testified that he did not learn until July 1987 that (1) Gilbert was not the sole owner and (2) McAllister and the Fox, Differ attorneys had been trying to get Suny to sign the Agreement since December 1986. See Plaintiff's App. I, Ex. B at 22–23; Defendants' App. II, Ex. J at 378. In contrast, Feld indicated that on December 10, 1986, Shenkman told him about

Suny's ownership interest in the property and the need to acquire Suny's signature. See Plaintiff's App. I, Ex. A at 22, 25–26. Because neither party alleges that Shenkman or any other defendant knew about the co-ownership of the lot before the Agreement of Sale was signed, this dispute is not material to the issue of whether this court should grant the defendants' motion for summary judgment.

8. Astor, Weiss and Newman provided legal services to Feld regarding all aspects of the purchase of the lots, with the exception of zoning.

9. On June 15, 1987, the Upper Merion Township Board of Supervisors granted various requested zoning changes for 115 West Dekalb Pike.

of the week, Gilbert would hear from the FBI.

On July 17, 1987, David Mandel, of Astor, Weiss & Newman, arranged for a meeting with Gilbert, Suny, McAllister and Shenkman to finalize the purchase of the property. Suny indicated that she owned 50% of the property and, as she had already told Gilbert, would not sell the lot for less than $520,000. After an alternative proposal made by Shenkman was rejected—that Gilbert waive his $33,000 and allow Today's Man to pay only an additional $33,000 to Suny—Shenkman and Suny reached an agreement in which Today's Man would pay the entire $520,000 price asked for the lot (rather than the $454,000 to which Gilbert had agreed at the October 31, 1986 meeting) in return for Suny's consent to the sale of the property.

At the July 17 meeting, Shenkman told Gilbert that Gilbert was to blame for the increased price and indicated his intention to ask counsel whether Gilbert's actions violated any criminal laws.[10] Shenkman then asked for and received another extension of time for settlement.[11] Mandel prepared an addendum to the Agreement of Sale that provided for a purchase price of $520,000 and an extension of the settlement date not to exceed September 20, 1987. The amendment also provided that the original agreement would remain in effect in all other respects. Gilbert and Suny signed the amendment, and Feld, who did not attend the July 17 meeting, also signed the amendment later that day when it was presented to him.

The day after the July 17 meeting, Shenkman told Callahan, a partner in defendant law firm, about the meeting. Shenkman considered Gilbert's actions outrageous and requested information about how to inform the proper authorities. Callahan believed that there was room to pursue criminal charges against Gilbert and agreed to research the issue and to find out how to report the information to someone at the District Attorney's office. Callahan then advised Tompkins—an associate in the firm who was for-

merly an Assistant District Attorney in Montgomery County—about the facts and circumstances of the case, relating what he had learned through his discussions with Shenkman. He instructed Tompkins to research whether Gilbert had violated any Pennsylvania criminal laws. According to Tompkins, Callahan indicated to him that Gilbert at some point had "represented" that he owned the property. Plaintiff's App. I, Ex. E, at 32–33. Tompkins then researched crimes that fit the described fact pattern and reported back to Callahan.

On August 6, 1987 Callahan instructed Tompkins to meet with Bruce Lukas of the Private Complaints Unit of the Montgomery County District Attorney's Office. Tompkins arranged the meeting with Lukas. Tompkins called Mandel, who had been present at the July 17 meeting with Suny, and asked him to attend the meeting with Lukas. On August 13, 1987, Tompkins and Mandel met with Lukas to determine if there was any basis for bringing criminal charges against Gilbert. At the meeting, Tompkins described the events and suggested criminal charges that he felt might be appropriate. Lukas agreed to consider the matter further and get back to Tompkins. The next day, Mandel sent Tompkins a copy of the Agreement of Sale, the July 17 Amendment, and the title report.

On September 10, 1987, Tompkins discussed the status of the charges against Gilbert with First Assistant District Attorney William Carpenter of the Montgomery County District Attorney's office. Tompkins told Carpenter that he was concerned that the district attorney's office was not working on the complaint. On or about September 14, 1987, Tompkins met with Carpenter for a second time and inquired again about the status of the charges against Gilbert. He informed Carpenter that the settlement on the Gilbert premises was set for September 16, 1987. Following that meeting with Carpenter, and believing that Lukas was not going to act on the charges against Gilbert,

---

**10.** Following the July 17, 1987 meeting, Feld gave Shenkman permission to use his discretion to take any appropriate actions against Gilbert.

**11.** Shenkman also requested a settlement extension from Euler on the Euler lots. Euler received $50,000 for the extension. Gilbert received no similar compensation.

Tompkins decided that he needed to discuss the matter directly with District Attorney Thomas Waters. Tompkins informed Callahan of the September 14 meeting and his intention to contact Waters.

On or before September 15, 1987, Tompkins met with District Attorney Waters to discuss the Gilbert transaction. Tompkins related the facts as he understood them and told Waters that he did not believe Lukas was giving the matter proper attention. Waters indicated that there was insufficient information at that time to support a criminal prosecution and told Tompkins that he should provide any documents he had to support the charges.

On September 15, 1987, Tompkins met again with Lukas. Lukas listened to Tompkins' version of the facts and informed Tompkins that he could not issue a warrant for Gilbert's arrest at that time despite the fact that settlement was scheduled for the next day. Tompkins then requested another meeting with District Attorney Waters, and Lukas agreed to accompany Tompkins to that meeting.

At the second meeting with Waters, also on September 15, Tompkins restated his understanding of the facts and showed Waters a private criminal complaint form he had prepared,[12] the Agreement of Sale, the title report and, possibly, the deed transferring the premises from Gilbert to Gilbert and Suny.[13] According to Gilbert, the account Tompkins gave to Waters was inaccurate in several respects. Most significantly, the private complaint recited that Gilbert had, at the July 17th meeting, "acknowledged that he had told Today's Man that he had authority to convey the property at 115 West DeKalb Pike" and that he had "represented such authority" to McAllister. Plaintiff's App. IV, Exh. OO. Moreover, according to Gilbert, Tompkins failed to inform Waters of the following potentially exculpatory facts: (1) Feld knew that Suny was a co-owner of the property as early as December 1986; (2) Feld, pursuant to paragraph 11 of the Agreement of Sale,[14] could have terminated the Agreement if the title to the property was defective; (3) Feld extended the Agreement of Sale in February 1987 for an additional six months despite his knowledge that Suny co-owned the premises and that her consent to the agreement had not been obtained; (4) Feld's lawyers and McAllister knew in December 1986 that Suny co-owned the premises and that Feld could not complete the transaction without her consent, but did not inform Feld of these facts; and (5) McAllister, who had prepared the Agreement of Sale, worked for Feld—not for Gilbert.

Based upon the information provided by Tompkins, Waters concluded that Gilbert's conduct amounted to criminal fraud and extortion. Waters believed that the criminal activity committed by Gilbert was "[r]epresenting himself to be the sole owner and then jacking up the purchase price to obtain the co-owner's signature."[15] Plaintiff's App. III,

---

12. Tompkins drafted the private criminal complaint approval form on Shenkman's behalf, naming Shenkman as the complainant and Callahan and Tompkins as Shenkman's private attorneys. *See* Plaintiff's App. IV, Ex. OO. The form contains a summary of the Gilbert transaction without indicating the source of the information it contains. According to Tompkins, Callahan and Shenkman provided most of the information contained in the private complaint's "summary of crime." That summary was used verbatim in the affidavit of probable cause attached to the first criminal complaint dated September 15, 1987. *See* Plaintiff's App. IV, Exh. PP.

13. Tompkins was not certain that he showed Waters the deed and could not recall if he showed Waters any additional information.

14. That paragraph provides in relevant part:
In case title is not as agreed ... Purchaser shall have only the option of completing settlement subject to such defect in title ... without abatement of price, or of terminating the agreement, in which latter event all copies of this agreement shall be returned to Seller, all monies paid on account hereof shall be refunded to Purchaser, and Seller shall reimburse Purchaser for the reasonable cost expended by Purchaser for a title search, whereupon this Agreement shall be null and void.
Plaintiff's App. II, Ex. T.

15. At his deposition, Waters indicated that he believed that Gilbert represented himself to be the sole owner in the Agreement of Sale itself.
Q: Where and when did [Gilbert] represent himself to be the sole owner?
A (Waters): In the agreement of sale.
Q: Where in the agreement of sale does it state that he's the sole owner?
A: It doesn't but it doesn't say he's a co-owner either.

Ex. EE at 26. Waters believed that Gilbert, while representing himself to be the sole owner of the property, knew that he was only the co-owner and used the fact that the sale could not be completed without the co-owner's signature to extort money from the buyers. Accordingly, Waters authorized the issuance of a criminal complaint.[16]

Later on the day of September 15, Tompkins told Callahan that Gilbert's arrest would occur following the settlement on September 16, 1987. Subsequently, Mandel, Shenkman and Feld were informed of Gilbert's impending arrest. Gilbert was not contacted.

Tompkins and Lukas briefly met with Chief of Detectives Oscar Vance after 4:00 P.M. on September 15, 1987. Tompkins gave Vance a copy of the private complaint form (that he had drafted) and perhaps also a completed criminal complaint for an arrest ("arrest complaint").[17] Tompkins orally summarized the information in the private complaint, and advised Vance that Waters wanted a criminal complaint to be drafted and an arrest warrant to be secured against Gilbert. Lukas confirmed that these were Waters' sentiments. Vance, who was told that Gilbert would appear the next day at settlement in Philadelphia and had scheduled a 4:00 p.m. flight to Florida for that day, understood that

Gilbert should be arrested immediately after settlement.

Toward the end of this meeting, Vance called defendant Edmund Justice, a county detective, into his office to discuss Gilbert's arrest. Vance handed Justice a completed criminal complaint, charging Gilbert with the offense of Securing Execution of Documents by Deception in violation of 18 Pa.C.S.A. § 4114 on October 21, 1986,[18] and a completed, typed probable-cause affidavit that, in significant part, mirrored the recital of facts contained in the private criminal complaint form that Tompkins had drafted. Vance told Justice to take the criminal complaint to Montgomery County District Justice Katherine Speers for her approval and for an arrest warrant for Gilbert. Vance also told Justice to carry out the arrest the following day.

After reading the complaint, the probable cause affidavit and section 4114 of the Pennsylvania Criminal Code, and without any additional investigation, Detective Justice signed both the criminal complaint and probable cause affidavit and brought those documents to District Justice Speers sometime after 5:00 p.m. on September 15, 1987. Justice Speers reviewed the criminal complaint and affidavit of probable cause, signed the complaint, and issued a warrant for Gilbert's arrest.[19]

Plaintiff's App. III, Ex. JJ at 26.

**16.** There is some confusion about whether Waters authorized the issuance of a public or private criminal complaint. Waters testified that he probably told Lukas to issue a private complaint and does not recall directing Tompkins to the County Detectives' Office. Plaintiff's App., Vol. III, Ex. JJ at 48. However, Lukas testified at his deposition that Waters determined that the case was not going to proceed as a private complaint and told Tompkins to go to the County Detectives' Office, take the necessary paperwork, and inform the County Detectives that they should investigate and process the matter. *See* Defendants' App. I, Ex. F at 211, 215. Similarly, Tompkins testified at his deposition that, when Waters decided to press criminal charges, Waters determined that the matter would proceed under the auspices of the County Detectives and the District Attorney's office as a standard criminal complaint, rather than as a private criminal complaint. *See* Plaintiff's App. I, Ex. E at 58–61. Like Lukas, Tompkins recalls that he was told to take the file to the County Detectives' Office. *See id.* at 65. Because I need not reach the issue of who initiated the proceedings against Gilbert in

order to dispose of the motions of summary judgment, this dispute is not material.

**17.** It is unclear from the record (1) whether Vance was also given a copy of the arrest complaint, and (2) who drafted the criminal complaint that ultimately was presented to the magistrate by defendant Edmund Justice, a county detective, later on September 15.

**18.** Section 4114 provides:

A person commits a misdemeanor of the second degree if by deception he causes another to execute an instrument affecting or purporting to affect or likely to affect the pecuniary interest of any person.

**19.** At the time she approved Gilbert's arrest, Justice Speers was not aware that Detective Justice lacked first-hand knowledge of the events described in the complaint, that Detective Justice had only received the complaint a half-hour before, and that the affidavit of probable cause was based upon a private criminal complaint drafted by Tompkins.

On September 16, 1987, the morning of the settlement, Detective Justice called Tompkins in order to get directions to the place of settlement and a physical description of Gilbert. Tompkins told Justice that he did not know Gilbert personally but that Shenkman could identify Gilbert at the settlement. Tompkins, Justice and William Davis, another Montgomery County detective, proceeded to the Philadelphia Police Administration building (the "Round House")[20] and then to the settlement at the law offices of White and Williams in Philadelphia.

There were fifteen to thirty people at the settlement, including Gilbert, Reed, Suny, Euler, Feld, Shenkman, and McAllister. Immediately following settlement, at which Gilbert and Suny conveyed the premises to Feld for $520,000, Shenkman accused Gilbert of cheating him and identified Gilbert for Tompkins. Out in the hall, Tompkins identified Gilbert for Detective Justice, who arrested Gilbert. Justice brought Gilbert to the Round House where he was held for four hours. Later that evening, Gilbert was taken to the Montgomery County Detectives' office and arraigned before District Justice Speers.

On September 17, 1987, Gilbert's attorney, Reed, telephoned Tompkins. Reed discovered the following: (1) Tompkins had been brought into the Gilbert matter to help deal with the procedure of filing charges against Gilbert, see Plaintiff's App. IV, Ex. RR at 156; (2) Tompkins did not apprise Reed of Gilbert's forthcoming arrest because he did not think there would be a settlement if Gilbert was arrested prior to settlement, see Plaintiff's App. IV, Ex. RR at 160–1, 166; and (3) the prosecution of Gilbert was an attempt to recover the extra money needed to settle with Suny, see Plaintiff's App. IV, Ex. RR at 163–64.

**20.** Justice stopped at the Round House to inform the local police that he would be making an arrest in Philadelphia.

**21.** Section 3922 provides:
(a) Offense Defined—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

Four days later, on September 21, 1987, McAllister went to the Montgomery County District Attorney's office to give a statement to Justice. Tompkins and Mandel attended the meeting. In his statement, McAllister indicated that, during their initial meetings, Gilbert never affirmatively stated that he was the sole owner of the premises. On September 30, 1987, Shenkman also went to the Montgomery County District Attorney's office to give a statement to Justice. Shenkman stated that, at the October 31, 1986 meeting, no one had directly asked Gilbert if he had the right to convey the property, but that Gilbert's statements and actions conveyed that impression. See Plaintiff's App. II, Ex. R. Shenkman also indicated that he did not learn about Suny's ownership interest until June or July 1987. Defendants' App. II, Ex. J at 378.

Following his arraignment, Gilbert petitioned the Court of Common Pleas of Montgomery County for a writ of habeas corpus. On October 22, 1987, after oral argument, the court granted Gilbert's petition and dismissed the complaint without prejudice to refile, holding that the affidavit of probable cause was legally insufficient under Rule 119 of the Pennsylvania Rules of Criminal Procedure because it did not identify the source of the information alleged therein.

On the day the complaint against Gilbert was dismissed, First Assistant District Attorney Carpenter told Justice to examine the documents, interview the witnesses, and, if the information in the original complaint was verified, to re-arrest Gilbert. Justice gathered some additional documents, and apparently talked to Tompkins in order to obtain additional information; however, Justice did not interview anyone else about the matter. Thereafter, Justice prepared a second criminal complaint (dated March 8, 1988), including an additional charge under 18 Pa.C.S.A. § 3922(a)(1) & (3) of "Theft by Deception."[21]

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other states of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

Justice also prepared another affidavit of probable cause that included a more detailed factual recitation and identified McAllister and Shenkman as the sources of the information obtained through the interviews of September 21, 1987 and September 30, 1987. Justice then sent the new affidavit of probable cause to Tompkins, who in turn gave it to Callahan for review. Callahan subsequently sent the affidavit to Shenkman for his review and comments. Justice then gave the affidavit to Montgomery County Assistant District Attorney William McElroy (who had been involved in the hearings on the initial complaint). McElroy reviewed the affidavit and, after urging Justice to make some minor changes in its form, signed it and presented it, along with the second criminal complaint, to District Justice John Kowal.

On March 8, 1988, District Justice Kowal approved the second complaint. Gilbert, having been given prior notice of the second complaint, surrendered to the authorities upon its issuance.

Gilbert again applied for a writ of habeas corpus. On January 5, 1989, after a preliminary hearing and oral argument on the habeas petition, the Montgomery County Court of Common Pleas granted Gilbert's petition for habeas corpus without opinion or explanation, and the charges against Gilbert were dropped.

In February 1989, Feld brought a civil action against both Gilbert and Suny in the Montgomery County Court of Common Pleas. Feld alleged, among other claims, that Gilbert made various fraudulent and negligent misrepresentations, breached their contract and, along with Suny, engaged in an unlawful civil conspiracy. In particular, Feld claimed that (1) with regard to the sale of the lot at 115 DeKalb Pike, Gilbert failed to reveal that Suny had a property interest in the lot equal to his own; (2) after Suny's interest was revealed, Gilbert repeatedly assured agents of the purchasers that Suny would consent to the Agreement; and (3) Gilbert used these misrepresentations to extort an additional payment of $66,000 from Feld for the lot. On September 18, 1991, the jury found that Gilbert had fraudulently misrepresented his interest in the property, and awarded Feld $66,000 in damages.[22] The Court of Common Pleas denied defendant Gilbert's motion for a j.n.o.v. or for a new trial, and, on November 23, 1992, the Superior Court affirmed the trial court's denial of Gilbert's post-trial motion. Gilbert's application for reargument is currently pending before the Superior Court of Pennsylvania.

On June 14, 1991—after Feld's state civil action against Gilbert was initiated, but before the trial—Gilbert filed the instant federal complaint against Feld, Shenkman, Tompkins, the defendant law firm, and Justice. The complaint alleged causes of action against all defendants for: (1) malicious prosecution; (2) abuse of criminal process; (3) false arrest/imprisonment; (4) intentional infliction of emotional distress; (5) civil conspiracy; and (6) violation of Gilbert's civil rights under 42 U.S.C. § 1983.[23] In a March 30, 1992 order, in response to defendants' motions to dismiss, I dismissed the § 1983 claims against the private-party defendants (Feld, Shenkman, Tompkins and the defendant law firm) and the civil conspiracy claim

(2) prevents another from acquiring information which would affect his judgment of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

(b) Exception.—The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

**22.** The jury did not find Gilbert liable for breach of contract, nor did it find Gilbert and Suny liable for civil conspiracy.

**23.** The procedural history antecedent to the filing of the instant case is somewhat complicated. On September 14, 1989, Gilbert filed parallel complaints in state and federal court; thereafter, the state case was stayed on agreement of the parties. One-and-one-half years later, the state court action was reactivated and promptly removed to federal court, resulting in two actions simultaneously in federal court. Pursuant to a May 1, 1991 Order of this court, the complaint filed on June 14, 1991 superseded the previous two related federal actions.

against defendant Justice, but allowed the § 1983 claim against Detective Justice and the various state law claims against all of the defendants to proceed, with diversity as the basis for federal jurisdiction against the private-party defendants. Thus the claims that remain are: (1) malicious prosecution (against all defendants); (2) abuse of criminal process (against all defendants); (3) false arrest/imprisonment (against all defendants); (4) intentional infliction of emotional distress (against all defendants); (5) civil conspiracy (against all defendants except Justice) and (6) civil rights violations under § 1983 (against Justice only). Presently before this court are the defendants' various motions for summary judgment on all of the remaining claims.

## II.

### Standard of Review

Summary judgment may be granted when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in that party's favor.

## III.

### Malicious Prosecution (all defendants)

■ Under Pennsylvania law, which the parties agree applies to plaintiff's state law claims, a plaintiff alleging malicious prosecution must prove that, whether the defendant is a law enforcement official or a private party, (1) the defendant instituted proceedings against plaintiff (a) without probable cause and (b) with malice, and (2) the proceedings terminated in favor of the plaintiff. *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 463

24. Pennsylvania has codified the tort of wrongful use of *civil* proceedings. *See* 42 Pa.C.S. §§ 8351–8354. However, the tort of malicious *criminal* prosecution has not been codified.

25. *See also Neczypor v. Jacobs*, 403 Pa. 303, 169 A.2d 528, 535 (1961) ("If there be reasonable or probable cause, *no malice, however distinctly proved, will make defendant liable*.") (emphasis in

(3d Cir.1993); *Kelley v. General Teamsters, Local Union 249*, 518 Pa. 517, 544 A.2d 940, 941 (1988)[24]. If any of these elements cannot be proven, the malicious-prosecution plaintiff cannot prevail.

There is no question that the criminal proceedings against Gilbert terminated in his favor (with the granting of his second petition for habeas corpus). Each of the defendants, however, disclaims responsibility for instituting the proceedings; and each of the defendants denies malice. Whether there are material issues of fact with respect to those ingredients of Gilbert's claim I need not determine, since I am persuaded that Gilbert has failed to establish that there was no probable cause for the institution of criminal proceedings against him.

■ A person who institutes a criminal proceeding with clear malicious intent cannot be held liable for the tort of malicious prosecution if, at the time of initiating charges, he or she has probable cause to believe that a crime has been or is being committed. That is to say, *"[w]ant of probable cause* is an indispensable element" of a claim of malicious prosecution. *Byers v. Ward*, 368 Pa. 416, 84 A.2d 307, 309 (1951) (emphasis in original).[25] According to the Pennsylvania Supreme Court:

> By probable cause is not meant an actual state of guilt. One is justified in launching a criminal investigation if the facts convince him, as a reasonable honest and intelligent human being, that the suspected person is guilty of a criminal offense.

*Neczpor v. Jacobs*, 403 Pa. 303, 169 A.2d 528, 530 (1961). The plaintiff bears the burden of demonstrating the absence of probable cause, notwithstanding the fact that the criminal proceedings terminated in his favor. *See Simpson v. Montgomery Ward & Co.*, 354 Pa. 87, 46 A.2d 674, 676 (1946) ("Neither an acquittal of the defendant in a criminal pros-

original) (internal quotation omitted); *Simpson v. Montgomery Ward & Co.*, 354 Pa. 87, 46 A.2d 674, 678 (1946) ("The existence of want of probable cause is ... essential to every suit for a malicious prosecution. Both that and malice must concur.") (omission in original) (internal quotation omitted).

ecution, nor the ignoring of the bill against him by the grand jury, nor his discharge by the examining magistrate, constitute proof of want of probable cause, or shifts the burden of proof to the defendant in the civil action."). The Pennsylvania Supreme Court has emphasized that the plaintiff's burden is a heavy one. Concerned that law enforcement not be compromised and that honest prosecutors not be deterred from seeing that criminals are brought to justice, the Pennsylvania Supreme Court has repeatedly noted that malicious prosecution claims are disfavored, with the risk of false accusation borne, as a general matter, by the defendant. *See Kelley*, 544 A.2d at 942; *Miller v. Pennsylvania R. Co.*, 371 Pa. 308, 89 A.2d 809, 810 (1952); *Simpson*, 46 A.2d at 681.

■ Motivated by this desire to shield the honest prosecutor from liability for damages flowing from an unsuccessful prosecution, and by the concern that jurors are apt to confuse the question of the criminal defendant's guilt or innocence, as determined in the criminal proceeding, with the question of whether the malicious prosecution defendant had probable cause to initiate that proceeding, Pennsylvania courts treat the existence of probable cause as a legal question for the court to decide before trial:

> There is no principle more firmly imbedded in the law than the principle that in case of malicious prosecution, the question of want of probable cause for the criminal prosecution which gave rise to the civil action, is a question not for the jury but for the court.... It has been immemorially held that the public interest requires that the legally trained mind of the judge and not the more or less emotional minds of jurors, decide whether or not there was probable cause for the initiation of the prosecution. Jurors are likely to confuse the issue of guilt or innocence of the defendant in the criminal case out of which the civil action originated with the basic issue whose determination decides the civil action. The basic issue is the want of probable cause for the criminal prosecution.

*Simpson*, 46 A.2d at 676. When the probable cause determination depends upon disputed issues of material fact, the trial court should submit only the factual disputes to the jury and then make the probable cause determination based upon the jury's findings of fact. *See Thomas v. E.J. Korvette, Inc.*, 476 F.2d 471, 475 (3d Cir.1973); *Simpson*, 46 A.2d at 678–79.

■ The test for probable cause described above has a subjective and an objective component. Whether a malicious prosecution defendant had probable cause to initiate the criminal prosecution out of which the malicious prosecution claim originated depends upon both: (1) whether the defendant *honestly* believed that the accused committed the crime for which the accused was prosecuted (the subjective component); and (2) whether the defendant *reasonably* believed that the accused was guilty of the crime charged (the objective component). *See Neczypor*, 169 A.2d at 531; *Simpson*, 46 A.2d at 678. I will address these two questions in turn, with respect to each of the defendants named in the malicious prosecution counts.

### A. Honesty of belief

1. Defendants Shenkman and Feld [26]

■ The existence of probable cause cannot be ascertained at the summary judgment stage with respect to Shenkman or any other defendant if Gilbert has produced evidence from which a jury could reasonably find that, at the time of the prosecution, the defendant in question lacked an honest or actual belief that Gilbert had committed a crime. However, with respect to Shenkman the uncontradicted evidence reveals that he actually believed that Gilbert had committed a crime at the time the criminal charges were brought.

It is undisputed that, when Shenkman, in mid-July of 1987, contacted the defendant law firm to see whether Gilbert could be prosecuted, Shenkman (1) knew that Gilbert had, on October 31, 1986, signed the Agreement of Sale that described him as the "Seller" and (2) believed that Gilbert had not told

---

**26.** Gilbert seeks to hold Feld liable for the alleged torts of his agent, Shenkman. *See* Gilbert's Brief in Opposition to Shenkman and Feld's Motion for Summary Judgment, at 67–70.

any representative of Today's Man about Suny's co-ownership before the Agreement was signed.[27] There is substantial and un-contradicted evidence, in the form of Shenkman's own statements to Gilbert, that Shenkman actually believed that Gilbert's conduct was criminal. In mid-July, 1987, Shenkman told Gilbert that Gilbert had "committed a criminal violation" and that if Suny did not sign the agreement by the end of the week, Gilbert would hear from the FBI. Plaintiff's App. III, Ex. DD at 96. After agreeing in the July 17th meeting to pay Gilbert the full $520,000 sought, Shenkman told Mandel that he thought that he had been a victim of extortion and indicated that he intended to ask counsel whether Gilbert's actions violated any criminal laws. Plaintiff's App. III, Exh. EE at 46–47. Immediately after settlement on September 16, 1987, Shenkman accused Gilbert and Suny of being crooks. See Plaintiff's App. II, Exh. H at 81–82; Plaintiff's App. II, Exh. G. at 51.

Gilbert points to no evidence that casts doubt on the sincerity of Shenkman's repeatedly expressed belief that Gilbert had committed a crime. Indeed, Gilbert himself relies on Shenkman's accusations as evidence of Shenkman's malice. See Gilbert's Brief in Opposition to Feld and Shenkman's Motion for Summary Judgment, at 64. Based on the facts considered in the light most favorable to Gilbert, I conclude there is no evidence of record that casts doubt on the proposition that Shenkman honestly believed that Gilbert's actions were criminal.

As explained in note 26, *supra*, Gilbert seeks to hold defendant Feld vicariously liable for the alleged malicious prosecution by his agent, Shenkman. Because there is no evidence to cast doubt on the honesty of Shenkman's belief that Gilbert had committed the crimes with which he was charged, there is likewise no reason to doubt the honesty of Feld's belief. ·

### 2. Defendant Tompkins and Defendant Law Firm [28]

■ Like Shenkman, Tompkins knew that Gilbert had signed the Agreement of Sale in which Gilbert was described as "Seller" without disclosing Suny's co-ownership of the property. Tompkins also testified that, based on his conversation with Callahan, he thought that Gilbert had at some point represented that he owned the property or had authority to convey it. See Plaintiff's App. I, Exh. E, at 32–33. It is undisputed that Gilbert did not make any affirmative representation to the effect that he was the sole owner of the property. Nonetheless, Gilbert points to no evidence that (1) suggests that Tompkins knew about the inaccuracy in the facts described by Callahan or (2) otherwise casts doubt on the honesty of Tompkins' belief that Gilbert's conduct was criminal.

As explained in note 28, *supra*, Gilbert proceeds against defendant law firm on a theory of vicarious liability. Because I find that there is no evidence in the record that casts doubt on the honesty of Tompkins' belief that Gilbert committed the crimes with which he was charged, there is likewise no evidence to cast doubt upon the honesty of the law firm's belief.

### 3. Defendant Justice

As described above, Tompkins and Lukas met with Chief of Detectives Oscar Vance on September 15, 1987, the day before the settlement. Tompkins gave Vance a copy of the private complaint form and a completed criminal complaint, and Tompkins also orally summarized the information for Vance. Toward the end of the meeting, Vance called Detective Justice into his office to discuss Gilbert's arrest. Vance gave Justice a copy of the completed criminal complaint and told

---

**27.** As described in note 4, *supra*, Gilbert testified that he told McAllister, when McAllister was drafting the October 31, 1986 Agreement of Sale, that Suny co-owned the property. McAllister denied that any such conversation occurred. Regardless, Gilbert has pointed to no record evidence suggesting that Shenkman knew anything about Suny's co-ownership at the time that Gilbert signed the original Agreement of Sale.

**28.** Gilbert seeks to hold the law firm liable for the alleged torts of its agent, Tompkins. *See* Gilbert's Brief in Opposition to Tompkins' and defendant Law Firm's Motion for Summary Judgment, at 63–67.

Justice to take the complaint to Montgomery County District Justice Katherine Speers for her approval and for an arrest warrant. Vance also instructed Justice to carry out the arrest. On September 16, 1987, Justice arrested Gilbert after the settlement.

 Although Gilbert criticizes Justice for failing independently to verify the facts in the criminal complaint—facts which were reiterated in the probable cause affidavit signed by Justice—Gilbert points to no evidence that Justice did not honestly believe that Gilbert had committed the crime charged, Securing Execution of Documents by Deception, 18 Pa.C.S.A. § 4114. After Gilbert's first habeas petition was granted on the ground that the probable cause affidavit failed to specify the sources of the information, First Assistant District Attorney Carpenter told Justice to examine the relevant documents and interview witnesses and, if the information in the original complaint was verified, to re-arrest Gilbert. Justice gathered some additional documents and interviewed Tompkins, then prepared a second criminal complaint which added the charge of Theft by Deception, 18 Pa.C.S.A. § 3922(a)(1) & (3). Again, Gilbert points to no evidence to cast doubt on the sincerity of Justice's belief that Gilbert had committed the crimes charged.[29]

### B. *Reasonableness of belief*

 On the undisputed facts, defendants Shenkman, Tompkins and Justice reasonably believed that Gilbert had committed the two crimes with which he was charged. Gilbert proceeds against defendant Feld and defendant law firm on a theory of vicarious liability for alleged torts of their agents. Therefore, I do not need to analyze independently whether Feld and the law firm reasonably

**29.** Gilbert contends that Justice is collaterally estopped from arguing that he had probable cause to arrest Gilbert. Gilbert refers to the October 22, 1987 Pennsylvania Court of Common Pleas opinion dismissing the criminal charge against defendant, without prejudice, because the affidavit for the arrest warrant did not include sufficient information for the magistrate to make an independent determination of probable cause as required by *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1986). *See* Plaintiff's App. IV, Exh. UU.

believed that Gilbert had committed the crimes with which he was charged.

In the first criminal complaint, Gilbert was charged only with Securing Execution of Documents by Deception, in violation of 18 Pa.C.S.A. § 4114. That section provides:

A person commits a misdemeanor of the second degree if by deception he causes another to execute an instrument affecting or purporting to affect or likely to affect the pecuniary interest of any person.

The second criminal complaint added the charge of Theft by Deception, in violation of 18 Pa.C.S.A. § 3922(a)(1) & (3). Section 3922 provides:

(a) Offense Defined—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other states of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

(2) prevents another from acquiring information which would affect his judgment of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

(b) Exception.—The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

After reviewing the October 22 opinion, I do not agree that the court held that defendant Justice did not have probable cause to arrest plaintiff; what the court held was only that the affidavit, which failed to provide the sources of the information, was insufficient to establish probable cause. Thus the issue decided by the Court of Common Pleas was not the issue I consider today: whether Justice honestly and reasonably believed that Gilbert had committed the crimes charged.

■ Gilbert protests that the first criminal complaint and affidavit of probable cause incorrectly stated that "Gilbert acknowledged that he had told Today's Man prior to the execution of the original Agreement that he had authority to convey the title to the property located at 115 West DeKalb Pike, and that he had represented such authority" to McAllister. *See* Plaintiff's App. IV, Exh. OO, Plaintiff's App. IV, Exh. PP. Gilbert argues that he made no such affirmative misrepresentation. However, neither of the crimes with which Gilbert was charged—18 Pa. C.S.A. § 3922(a) and 18 Pa.C.S.A. § 4114—requires an affirmative representation.

At issue in *Commonwealth v. Warner*, 504 Pa. 600, 476 A.2d 341 (1984), was whether a woman who had committed welfare fraud could be charged under both the "Theft by Deception" statute, 18 Pa.C.S.A. § 3922, and a welfare statute, 62 P.S. § 481(a). The Pennsylvania Supreme Court concluded that, on the facts, the two statutes did not encompass identical activity. The court quoted from the Commonwealth's brief as follows:

"From the time period between January, 1978 and April 24, 1978, the defendant committed the crime of Theft by Deception, 18 Pa.C.S.A. § 3922(a) each time she cashed an assistance check because the defendant created the false impression that she was entitled to the money she was receiving.[30] The defendant's failure to in-form the Welfare authorities of her earnings during the time period of January to April 24, 1978 amounted to theft under the general language of the Crimes Code but did not amount to willful false statements of misrepresentation under the Welfare Code, 62 P.S. § 481(a) because the defendant made no statements whatsoever to the Welfare authorities."

*Id.* 476 A.2d at 343. That is, the court concluded that, unlike the welfare statute, § 3922(a) encompasses the situation in which the defendant made no affirmative misrepresentations but rather created a false impression by her actions.

The commentary to the Model Penal Code provisions upon which the Pennsylvania crimes at issue are based provides further support for the conclusion that no affirmative misrepresentation is needed to trigger criminal liability. Section 3922 is based upon § 223.3 of the Model Penal Code.[31] *See* 18 Pa.C.S.A. § 3922, Historical Note. Section 4114 is based upon § 224.14 of the Model Penal Code.[32] *See* 18 Pa.C.S.A. § 4114, Historical Note. The texts of the provisions of the Pennsylvania code track the texts of the provisions of the Model Penal Code in all respects relevant to the case at bar.

According to Comment 2 to Model Penal Code § 224.14, "Securing Execution of Documents by Deception," the term "deception" in

**30.** In a footnote to this statement, the court explained: "This [statement in the Commonwealth's brief] refers to the fact that welfare checks typically bear an endorsement warning that failure to report earnings prior to cashing the check could result in a fine or imprisonment for false statements." *Id.*, 476 A.2d at 343 n. 4.

**31.** *Section 223.3 of the Model Penal Code, "Theft by Deception," provides:*

A person is guilty of theft if he purposely obtains the property of another by deception. A person deceives if he purposely:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise; or

(2) prevents another from acquiring information which would affect his judgment of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship; or

(4) fails to disclose a known lien, adverse claim or other legal impediment to the enjoyment of property which he transfers or encumbers in consideration for the property obtained, whether such impediment is or is not valid, or is or is not a matter of official record.

The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

**32.** Section 224.14 of the Model Penal Code, "Securing Execution of Documents by Deception," provides:

A person commits a misdemeanor if by deception he causes another to execute any instrument affecting, purporting to affect, or likely to affect the pecuniary interest of any person.

that provision "is designed to refer to the types of conduct catalogued in Section 223.3 of the Model Code relating to theft by deception." Comment 3(f) to Model Penal Code § 223.3 explains that that section "incorporate[s] into the concept of punishable fraud certain cases where the actor does not purposely create or reinforce a false impression but where he . . . fails to correct the victim's misimpression in circumstances giving rise to a duty of affirmative disclosure." Specifically, § 223.3(3)—which is identical to 18 Pa. C.S.A. § 3922(a)(3)—"imposes an affirmative duty to correct false impressions of the victim . . . where the actor has previously contributed (however innocently) to the creation of the false impression. . . ."

 On the undisputed facts, the defendants reasonably believed that Gilbert had committed the crimes charged. Shenkman's initial misimpression that Gilbert was the sole owner—based upon McAllister's reference to the Philadelphia Real Estate Directory and Callahan's reference to the tax map—was not created by Gilbert. However, by signing the original Agreement of Sale without disclosing Suny's interest in the property, Gilbert clearly contributed to Shenkman's misimpression of Gilbert's sole ownership. Although Gilbert acknowledges that one cannot legally sell that which one does not own or possess, *see* Gilbert's Brief in Opposition to Feld and Shenkman's Motion for Summary Judgment, at 52 n. 26 (citing *Pennsylvania Electric Co. v. Shannon*, 377 Pa. 352, 105 A.2d 55, 59 (1954)), he adds that one might enter into a binding agreement to sell property in which another has an interest, because a court will presume that the seller will acquire the outstanding interest in order to complete the sale. *See* Gilbert's Brief in Opposition to Feld and Shenkman's Motion for Summary Judgment (citing *Detchon v.*

*McSorley,* 301 Pa. 493, 152 A. 689, 690 (1930)). Gilbert's own conduct and statements, however, belie any suggestion that Gilbert intended to acquire Suny's interest at his own expense in order to deliver the entire property to Feld. As Gilbert testified, Shenkman proposed alternatives to Suny's demand that Today's Man pay an additional $66,000. For example, Shenkman suggested that Today's Man would pay Suny $33,000— her fifty percent share of the additional $66,000 sought—but Gilbert would waive his $33,000. *See* Defendants' App. IV, Exh. S at 1314. As Gilbert himself testified, he responded: "Zeev, there's nothing I can do about this. I will agree to anything that my grandmother will agree to." *See id.* at 1315. Gilbert went on to testify, "I was not the dissenting party at this time. There was nothing that I could do. The agreement had to be struck between Mr. Shenkman and my grandmother. So there was no point in his trying to convince me of something." *See id.* Suny insisted that Gilbert accept no less than $520,000 for the property, and Gilbert went along with Suny's demand. Gilbert's statements and conduct reveal that he had no intention of acquiring Suny's interest at his own expense. Consequently, Gilbert's act of signing the original Agreement of Sale without disclosing Suny's ownership interest clearly reinforced Shenkman's false impression that Gilbert was the sole owner of the lot. Under § 3922(a)(1), a person deceives if he intentionally "creates or reinforces a false impression." Accordingly, there is no evidentiary basis for concluding that the belief by defendants Shenkman, Tompkins and Justice that Gilbert had violated § 3922(a)(1)— and § 4114, because the term "deception" in that provision refers to the conduct described as deception in § 3922(a)—was unreasonable.[33]

33. Gilbert objects to a number of other inaccuracies and omissions in the two criminal complaints and affidavits of probable cause. Specifically, Gilbert objects to the documents for failing to state that: (1) Feld knew that Suny was a co-owner of the property as early as December 1986; (2) Feld, pursuant to paragraph 11 of the Agreement of Sale, could have terminated the Agreement if the title to the property was defective; (3) Feld extended the Agreement of Sale in February 1987 for an additional six months despite his knowledge that Suny co-owned the premises and that her consent to the Agreement had not been obtained; (4) Feld's lawyers and McAllister knew in December 1986 that Suny co-owned the premises and that Feld could not complete the transaction without her consent, but did not inform Feld of these facts; and (5) McAllister, who had prepared the Agreement of Sale, worked for Feld—not for Gilbert.

These inaccuracies and omissions may be relevant to a question not reached by this court—the

Because I conclude, based on the undisputed facts, that the only fair inference is that defendants Shenkman, Feld and Justice honestly and reasonably believed that Gilbert had committed the crimes charged, Gilbert's malicious prosecution claim against these defendants must fail. Because Gilbert seeks to hold defendant Feld and defendant law firm liable for the alleged torts of their agents Shenkman and Tompkins, respectively, his claims against Feld and the law firm fail as well.

## IV.

### Abuse of Process (all defendants)

 Whereas a malicious prosecution claim depends upon the wrongful initiation of a meritless suit, "abuse of civil process is concerned with a perversion of [legal] process after it is issued." *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020, 1023 (1987) (citations omitted). Under Pennsylvania law, an abuse of process claim has two basic elements: "an ulterior motive and a use of the process for a purpose other than that for which it was designed."[34] *Harvey v. Pincus,* 549 F.Supp. 332, 340 (E.D.Pa.1982), *aff'd,* 716 F.2d 890, *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). The existence of probable cause is immaterial to this claim, as is a showing that the prior proceedings were terminated in the plaintiff's favor. *See id.* The classic example of an abuse of process claim is " 'one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it.' " *Rosen v. Tesoro Petroleum Corp.,* 399 Pa.Super. 226, 582 A.2d 27, 32 (1990) (quoting *Restatement (Second) of Torts,* § 682 at 475, comment b. (1977)). The Pennsylvania courts emphasize:

"A cause of action for abuse of process requires [s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process ... [;] there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."

*Rosen,* 582 A.2d at 32 (quoting *Shaffer v. Stewart,* 326 Pa.Super. 135, 473 A.2d 1017, 1019 (1984) (alterations and omissions in *Rosen* ) (internal quotation omitted)).

 On the facts taken in the light most favorable to Gilbert, defendants Shenkman and Feld did not act in a manner "not authorized by the process, or aimed at an objective not legitimate in the use of the process." Gilbert asserts that the defendants used process for an improper purpose because they (1) used the criminal process "to inflict retribution on Gilbert because of a civil complaint involving no criminal conduct" and (2) sought to have Gilbert's arrest delayed until after settlement in order to ensure the consummation of the sale. Neither of these arguments has merit. Retribution is a legitimate objective of the criminal process, and, as I concluded above, the defendants had probable cause to believe that Gilbert had committed a crime. Shenkman and Feld's effort to delay Gilbert's arrest until after settlement—in order to ensure that closing occurred and thus to prevent further loss due to Gilbert's action—also amounted to a legitimate objective of the legal process. For these reasons, Gilbert's abuse of process claims against Shenkman and Feld fail.

Gilbert claims that Tompkins, the defendant law firm, and Justice are liable for abuse of process because they acted to accommodate the Feld–Shenkman desire to have Gilbert arrested after settlement oc-

question of who initiated the criminal proceedings. *See Griffiths v. CIGNA Corp.,* 988 F.2d 457, 464 & n. 5 (citing comment g to section 653 of the Restatement (Second) of Torts for the proposition that if a private person *knowingly gives* a police officer false information, the officer cannot intelligently exercise his or her discretion to prosecute, and the private person may be held responsible for initiating the criminal proceedings). Apart from the inaccurate statement that Gilbert had represented himself as sole owner,

the inaccuracies and omissions do not cast doubt on the reasonableness of the defendants' belief that Gilbert had committed the crimes charged.

**34.** Pennsylvania also has required that a plaintiff bringing an abuse of process claim prove a seizure of his person or property. *See Harvey v. Pincus,* 549 F.Supp. 332, 340 n. 6 (E.D.Pa.1982). Gilbert has clearly met this requirement.

curred. Because I have concluded that the Feld–Shenkman effort to have the arrest occur after settlement was not an abuse of process, it follows that Tompkins, the law firm, and Justice did not abuse process by accommodating that effort.

## V.

### False Arrest/Imprisonment (all defendants)

██ Under Pennsylvania law, a false arrest consists of an arrest made without probable cause. *See Valenti v. Sheeler,* 765 F.Supp. 227, 231 (E.D.Pa.1991). Because I have concluded that all of the defendants had probable cause to arrest or institute the arrest of Gilbert, Gilbert's false arrest claims cannot survive the defendants' motions for summary judgment.

██ False imprisonment, under Pennsylvania law, has two elements: (1) the detention of the person; and (2) the unlawfulness of that detention. *See Valenti,* 765 F.Supp. at 232. An unlawful arrest—that is, an arrest without probable cause—gives rise to a cause of action for false imprisonment as well as false arrest. *See id.* Because I have concluded that Gilbert's arrest was not unlawful, his false imprisonment claims against the defendants fail.

## VI.

### Intentional Infliction of Emotional Distress (all defendants)

██ Under Pennsylvania law, the elements of the tort of intentional infliction of emotional distress are: (1) extreme or outrageous conduct, (2) which is intentional or reckless, and (3) causes severe emotional distress. *Denenberg v. American Family Corp. of Columbus, Ga.,* 566 F.Supp. 1242, 1251 (E.D.Pa.1983). The court must first determine, as a matter of law, whether a reasonable person could find defendant's conduct "so extreme and outrageous as to permit recovery." *Motheral v. Burkhart,* 400 Pa.Super. 408, 583 A.2d 1180, 1188 (1990).

Pennsylvania courts have been reluctant to declare conduct outrageous. *See Clark v. Township of Falls,* 890 F.2d 611, 623 (3d Cir.1989). For example, *Motheral v. Burkhart,* 400 Pa.Super. 408, 583 A.2d 1180 (1990), involved a custody dispute between Motheral and his former wife, Burkhart, over their daughter. Motheral alleged that Burkhart's attorney, Lesko, told a police officer that Burkhart was to testify that Motheral had sexually molested his daughter. The court held that, even accepting as true Motheral's allegations that Lesko knew her statements to the officer to be false, the conduct attributed to her was not so outrageous as to support a claim for intentional infliction of emotional distress. *See id.,* 583 A.2d at 1189–90.

██ Gilbert argues that the following actions were outrageous: (1) instituting Gilbert's arrest without probable cause (all defendants); (2) permitting Gilbert to be arrested after settlement in front of his grandmother (all defendants); (3) threatening to contact the FBI (Shenkman); and (4) accusing Gilbert of being a thief and telling Gilbert, "We're going to get you" (Shenkman); (5) placing Gilbert in handcuffs and requiring him to walk five or six blocks (Justice); (6) transferring Gilbert, without instructions to do so, to the Round House in Philadelphia (Justice); (7) detaining Gilbert for several hours before arraignment (Justice); (8) persuading Gilbert to waive his arraignment in Philadelphia until his transfer to Montgomery County; (9) rearresting Gilbert without probable cause (Justice); (10) failing to investigate the second affidavit of probable cause (Justice); (11) signing the second affidavit despite knowledge that Feld and his agents knew in December 1986 about Suny's co-ownership (Justice).

I have already concluded that the defendants had probable cause to initiate charges against and arrest Gilbert. In light of that conclusion, it cannot be considered outrageous for Shenkman to call Gilbert a thief or threaten to contact the authorities. Nor, given Suny's involvement with the transactions giving rise to probable cause, was it outrageous for the arrest to occur in her presence. Likewise, none of Justice's conduct to which Gilbert objects can be considered outrageous under Pennsylvania precedent.

## VII.

### Civil Conspiracy (all defendants except Justice)

██ Due to the absence of a valid claim for any of the underlying torts of malicious prosecution, abuse of process, false arrest/imprisonment, and intentional infliction of emotional distress, Gilbert's civil conspiracy claims also fail. *See Rosen v. Tesoro Petroleum Corp.*, 399 Pa.Super. 226, 582 A.2d 27, 33 (1990).

## VIII.

### Civil Rights Violations under § 1983 (Justice)

██ To support his claim against Justice for a civil rights violation under 28 U.S.C. § 1983, Gilbert must prove: (1) that he was deprived of rights, privileges or immunities secured by the Constitution or laws of the United States due to (2) the conduct of a person acting under color of state law. *See Cohen v. City of Philadelphia*, 736 F.2d 81, 83 (3d Cir.1984), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981)). As determined above, Justice had probable cause to arrest Gilbert. Therefore, Justice deprived Gilbert of no right secured by the Constitution or law of the United States, and Gilbert's § 1983 claim against Justice fails.

## IX.

### Conclusion

For the reasons given above, the defendants' motions for summary judgment will be granted and the plaintiff's case dismissed in its entirety.