

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-22-1996

# Beck v. Williams

Precedential or Non-Precedential:

Docket 95-3328

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Beck v. Williams" (1996). *1996 Decisions.* Paper 108.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/108

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 95-3328
_____


ROBERT BECK,

                         Appellant,

                    v.

CITY OF PITTSBURGH,

                         Appellee.


_____

An Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. No. 94-cv-156
_____


Argued May 21, 1996

Before:  SLOVITER, Chief Judge,
SAROKIN and ROSENN, Circuit Judges.

(Opinion Filed  July 22, 1996)
_____

Colin E. Fitch, Esquire (argued)
Marriner & Crumrine
800 Washington Trust Building
Washington, PA  15301
Counsel for Appellant


Virginia S. Scott, Assistant City Solicitor (argued)
Jacqueline R. Morrow, City Solicitor
City of Pittsburgh
Department of Law
Firm #046
313 City-County Building
414 Grant Street
Pittsburgh, PA  15219
Counsel for Appellee

_____

ROSENN, Circuit Judge.

This appeal raises a question of considerable interest in this period of alleged rising police brutality in major cities across the country: when does an aggrieved citizen adduce sufficient evidence to a jury from which it can infer that a municipality has adopted a custom of permitting its police officers to use excessive force in the performance of their duties. Specifically, we must determine if the plaintiff, Robert G. Beck, presented sufficient evidence to withstand a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).

Beck, a rehabilitation counsellor for the Epilepsy Foundation of America, sued Police Officer Anthony Williams and his employer, the City of Pittsburgh, in the United States District Court for the Western District of Pennsylvania, under 42 U.S.C. 1983, for deprivations of his constitutional rights. Beck alleged that Williams engaged in police brutality and used excessive force against him while making an arrest, and that the City of Pittsburgh's custom of tacitly authorizing its police officers to use excessive force resulted in Beck's personal injuries and damages. Beck brought additional pendent state law tort claims against Officer Williams.

The district court bifurcated Beck's cases against Williams and the City of Pittsburgh. Beck's case against Williams ended in a mistrial when the jury could not return a verdict. Beck dropped his case against Williams, and proceeded only against the City. After Beck presented his case, the City moved for judgment as a matter of law. The court granted the motion, holding that Beck presented insufficient evidence for a reasonable jury to find that the City of Pittsburgh had established a policy or custom tacitly authorizing its police officers to use excessive force. Beck timely appealed to this court. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

I.

In the early morning hours of October 31, 1993, Beck and two college friends left a Halloween party on the South Side of Pittsburgh. Beck had borrowed his parents' car for the evening, and parked it in a vacant lot near the party site. It had begun to sleet, and as Beck began to drive the car toward the exit of the parking lot, it skidded in circles on the wet pavement. Although the parties have differing views on what occurred next, for the purposes of this appeal, we must view the evidence in a light most favorable to Beck, the nonmoving party. See Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir. 1987). Thus, we take the facts from Beck's testimony and other evidence presented by him at trial.

Beck testified that Officer Williams, working alone, blocked the only exit from the lot with his police cruiser.

Williams stopped Beck's car, and ordered him out of the vehicle. Beck claimed that he complied with all of Officer Williams's commands. Williams kicked the door shut as Beck attempted to get out of his car, then jerked open the door, and pushed his gun into Beck's face. After cursing at Beck and using obscene language, Williams allegedly struck him in the face six to eight times with the end of his gun, pulled Beck from the car, forced him to the ground, and kicked him in the ribs. At this time, several other police officers arrived at the scene. An officer placed Beck into Williams's police vehicle, and Williams, alone, removed Beck to the police station. There, he charged Beck with "driving under the influence" and reckless driving, and lodged him in a cell.

Subsequently, Beck filed a formal civilian complaint with the Police Department against Williams. The Office of Professional Standards ("OPS"), the city department responsible for investigating complaints against police officers, investigated. OPS took statements from Beck, his two companions who witnessed the incident, and Officer Williams. Although Beck's friends fully supported Beck's allegations, OPS found Beck's complaint to be unfounded, noting that the mug shot taken on the night he was in custody did not reveal any evidence of the trauma he claimed.

At trial, Beck called Carla Gedman, a civilian assistant chief of OPS, as a witness. Gedman supervises all OPS employees and investigators, and is responsible for forwarding all OPS findings through the chain of command in the Pittsburgh Police Department to the Chief of Police. Gedman testified that OPS acts as a fact-finding body, and is not responsible for disciplining police officers. OPS merely investigates each complaint against an officer for use of excessive force, and decides whether the complaint is "unfounded," "exonerated," "not sustained," "sustained," or "closed by memo." It makes no recommendations. OPS merely forwards its result to Police Department officials (see supra note 4). The Department may overturn any OPS finding. Gedman could not remember, however, if the Department ever actually had reversed an OPS finding.

Gedman testified that OPS will classify a complaint as "unfounded" when the facts indicate that the complainant is untruthful or inaccurate; and as "exonerated" when everything the complainant states is true, but OPS finds that the officer followed proper police procedure. OPS will label a complaint as "closed by memo" when a complainant drops the claim, or is uncooperative in the investigatory process. Further, OPS applies a preponderance of evidence standard in determining whether to sustain a complaint. Gedman explained that the complainant has the burden of showing that 51% of the evidence supports his or her version of the incident. Beck contends that OPS's preponderance standard mandates a finding of "not sustained" whenever OPS is faced with only the complainant's word against the officer's word. Gedman stated that she "wouldn't be comfortable" with that assessment. She testified, however, that a finding of "not sustained" amounts to a "draw," where OPS can neither prove nor disprove the allegations.

According to Gedman, OPS approaches each complaint against a police officer as a separate, independent event.  Thus, OPS cabins each complaint and will not consider prior conduct of or prior complaints against the officer in determining the outcome of the pending complaint.  Gedman further testified that OPS has no formal policy or mechanism in place to track prior complaints.  She noted that, in the exercise of her discretion, she may alert police officials if she notices that an officer has a number of complaints against him or her within a short period of time, e.g., two months.  From her perspective, Gedman testified that she did not consider prior complaints of the use of excessive force relevant in assessing the pending complaint under investigation.  She further stated:  "We do not report patterns of cases to the police bureau."  However, the OPS annual report does contain statistics of complaints relating to police use of excessive force and statistics pertaining to complaints of police verbal abuse.  In some cases where Gedman believes it to be relevant, Gedman testified that she may report a series of incidents to the chain of command for a particular officer, but that is within her discretion.  She does not have a formal system for determining when or what particular conduct calls for such a report.

Beck also offered in evidence excerpts of the deposition of Charles Moffit, Pittsburgh's assistant chief of operations.  Moffit is the first person in the police chain of command to review OPS findings.  He stated that the Police Department will only take an officer's prior conduct into account in reviewing an OPS finding if OPS has sustained a complaint against the officer for that conduct.

In addition to the above, Beck introduced reports of specific civilian complaints against Williams for use of excessive force.  In October 1990, OPS investigated a written complaint filed against Officer Williams by Demetrius Yancey.  Yancey complained that for no apparent reason, Williams grabbed him and pushed his face hard against the police vehicle.  The officer searched him and was verbally abusive.  The OPS report of the case found:  Yancey's brother, who was present at the incident, gave a statement to the investigator almost identical to the complainant's.  Both brothers were questioned separately and there were no inconsistencies.  "The Yancey brothers were very vehement on the denunciation of Officer Williams conduct and also they were believable."  The report, however, recommended that the case be closed as not sustained because "there is [sic] no in depth corroborations of the allegations."

On April 10, 1991, OPS received a civilian complaint against Officer Williams from Dr. Irwin T. Templeton.  OPS sent this complaint to Williams's commanding officer for investigation.  The Chief of Police ultimately exonerated Officer Williams.

In June 1991, Dwayne Jones, a citizen, filed a complaint with OPS charging that while he was jogging, Officer Williams "for no apparent reason grabbed him and threw him into the rear of the police car. . . ."  He was hand-cuffed and removed to a police station.  Williams ignored Jones's complaints that the

cuffs were too tight and hurting, searched him, found nothing, issued a citation and released him to a relative. The complaint was not sustained because "there wasn't any evidence to prove or disprove the allegations." The complaint also charged that Williams addressed him with obscene language and called him a "punk."

On July 8, 1991, Wayne Harvard filed a citizen's complaint with OPS charging Officer Williams with assaulting him and hitting him on the head and face with a billy club and with verbal abuse. Hospital records described the source of Harvard's injuries as a fall or beating with a club. Harvard admitted to falling in a foot chase but claimed that Williams struck him in the face causing some of the injuries. He alleged that after he put his hands behind his back as ordered, Williams put handcuffs on him and "took a billy club, a small billy club, and hit me on the side of the face." When Harvard inquired why the attack, Williams did not reply but "kept on hitting me and just beating me up" and called for back up.

On November 4, 1993, the plaintiff in this case filed his handwritten complaint with OPS. In investigating this complaint, OPS also had written statements from each of Beck's friends who witnessed the alleged assault. The complaint was disposed of as "unfounded." In accordance with its practice, OPS made no reference to previous complaints against Officer Williams.

Slightly over two months later, on January 24, 1994, Donald Debold filed a complaint against Williams, who, with other officers, had come to his home to answer a domestic call. The officers questioned Debold three times as to whether he had hit anyone. When Debold answered in the negative, Williams began to taunt him. Debold then said something to Officer Williams who responded by punching him in the jaw. OPS exonerated Officer Williams.

None of the foregoing complaints was sustained and none of them resulted in discipline. None of these dispositions was overruled by the Chief of Police or his assistant. However, the Police Department did discipline Officer Williams once: this action arose out of an internal police claim that he verbally abused a fellow police officer using language similar to that which Williams allegedly used in his past encounters with the civilian complainants. As the district court observed and counsel for the City agreed: "This shows that they treat a complaint by a fellow officer seriously."

Finally, Beck introduced OPS year-end reports, circulated through the Police Department, for the years 1991 and 1994. The 1994 report revealed that OPS sustained an overall 3.4% of "use of force" complaints in the years 1990 through 1994. The 1991 report noted, inter alia:

> Use of force has been an issue in the past. Actual discipline for excessive force is very low.
>
> Unlike many other police departments, ours does not employ any formalized reporting mechanism for the use of force . . . . This type of report allows objective evaluations of the use of force before

complaints are filed.  It would certainly identify points for retraining, and officers typically engaged in this behavior.  We could develop a better understanding of the vague phrase "reasonable use of force," as incidents routinely reported could be audited and properly examined . . . .  Most cases cannot be sustained because it is usually the officer and complainant on the scene only; and no neutral evidence is available.  We do report patterns of cases to the Police Bureau however; e.g. an officer receiving three complaints in two months.

The independent events do not indicate that the civilians conspired against one particular officer.  The officer's credibility is at issue when a discernable pattern of complaints develop [sic] . . . officers and patterns like this will be focus [sic] of our "early I.D." program . . . those that can't control their temper or use verbal skills properly, run the risk of aggravating the very situation which they are called upon to assist.

After Beck rested his case, the City moved for judgment as a matter of law.  See Fed. R. Civ. P. 50(e).  The district court granted the motion, holding that Beck failed to present sufficient evidence to prove that the City had a policy or custom authorizing the use of excessive force by its police officers.

## II.

Federal Rule of Civil Procedure 50(a) provides, in pertinent part:

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  This court's review of the district court's grant of judgment as a matter of law is plenary, and we must apply the same standard as the district court.  SeeLightening Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  A motion for judgment as a matter of law under Federal Rule 50(a) "should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." Macleary, 817 F.2d at 1083.

Beck claims that the City of Pittsburgh is liable for the injuries and damages he sustained at the hands of one of its police officers.  He alleges that the City, "through its relevant

officials, tolerated and acquiesced in a custom of excessive use of force by its police officers by permitting a situation to exist where police officers were not disciplined or subject to review for the use of excessive force against citizens."  Beck brings this claim under 42 U.S.C.  1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C.  1983.

Because Beck's claim is not based on ordinary negligence or tort principles but on a federal civil rights statute, the City is not liable under the doctrine of respondeat superior for the misconduct of its police.  Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).  When a suit against a municipality is based on  1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.  Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978).  Thus, although the municipality may not be held liable for a constitutional tort under  1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom. Id. at 694.

The Court's holding and reasoning in Monell have created a two-path track to municipal liability under  1983, depending on whether the allegation is based on municipal policy or custom. See Pembaur v. City of Cincinnati, 475 U.S. 469, 481 & n.10 (1986).  In Andrews, this court articulated the distinctions between these two sources of liability:

> A government policy or custom can be established in two ways.  Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict.  A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

895 F.2d at 1480 (citations omitted); see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (same).  Custom, on which the plaintiff relies in this case, may also be established by evidence of knowledge and acquiescence.  See Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989), cert. denied, 492 U.S. 919 (1989).

In City of Canton v. Harris, 489 U.S. 378 (1989), Officers of the Canton Police Department arrested Geraldine Harris.  While

being processed at the police station, she fell down several times and became incoherent.  The officers did not summon any medical assistance for her.  Sometime after her release she sued for damages under 42 U.S.C.   1983.  The Court held that the inadequacy of police training may serve as the basis for   1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Id. at 388 (footnote omitted). Although City of Canton involved a city's alleged failure to train its police officers, courts have adopted the "deliberate indifference" standard in other policy and custom contexts.  See e.g., Simmons v. City of Philadelphia, 947 F.2d 1042, 1070 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992); see also Karen M. Blum, Monell, DeShaney, and Zinermon:  Official Policy, Affirmative Duty, Established State Procedure and Local Government Liability Under Section 1983, 24 CREIGHTON L. REV. 1, 13 (1990).  This is consistent with the Court's narrow construction of municipal liability under 42 U.S.C.   1983 since Monell, limiting municipal liability to only those constitutional torts actually caused by the municipality.  See Michael T. Burke & Patricia A. Burton, Defining The Contours of Municipal Liability Under 42 U.S.C. 1983: Monell through City of Canton v. Harris, 18 STETSON L. REV. 511, 547 (1989).

In Simmons, 947 F.2d 1042, the plaintiff sued the City of Philadelphia under various theories of   1983 liability for failing to prevent her son from committing suicide while in police custody.  The plaintiff alleged that the City failed to properly train its employees in the prevention of suicide of intoxicated detainees, and that the City's policy or custom led to her son's death.

We held, in Simmons, that:

> In order to establish the City's liability under her theory that Simmons's rights were violated as a result of a municipal policy or custom of deliberate indifference to the serious medical needs of intoxicated and potentially suicidal detainees, plaintiff must have shown that the officials determined by the district court to be the responsible policymakers were aware of the number of suicides in City lockups and of the alternatives for preventing them, but either deliberately chose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction in this regard.

Id. at 1064 (emphasis added).

In Bielevicz, the plaintiffs alleged a violation of   1983 against the City of Pittsburgh for a municipal custom of allowing its police officers to make illegal arrests for intoxication.  We held that to sustain a   1983 claim for municipal liability, the plaintiff must "simply establish a municipal custom coupled with causation--i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led

to their injury."  915 F.2d at 851.

In the instant case, Beck argues that Officer Williams has exhibited a pattern of violent and inappropriate behavior, with five complaints of excessive use of force in less than five years.  These complaints include the Debold incident, which, although it occurred after Beck's experience, may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force.  Beck asserts that if the City had proper investigative and police disciplining procedures in place, its police, including Williams, would not have pursued a settled practice of applying excessive force in arresting citizens, and Williams, in particular, would not have assaulted him.

The district court granted the City's motion for judgment as a matter of law, holding that Beck did not present sufficient evidence to show that the City had a policy or custom of authorizing the use of excessive force or abusive behavior.  The court addressed plaintiff's counsel, stating:

> You would have the jury infer that because Williams was never disciplined, the City tacitly authorized the use of excessive force.  But I think the law is clear that the jury can't make that assumption.  Judge Cohill has an opinion in this court saying that isolated events will not establish a pattern of abusive behavior.  Recitation of the number of complaints filed is not sufficient to prove a policy or custom.  Policy or custom have to be established by knowledge and acquiescence.  I think [the] absen[ce of] any evidence of a less than meaningful investigation or less than meaningful response to complaints of excessive force is fatal.

III.

Under Federal Rule of Evidence 404(b), evidence of other wrongs or acts, although not admissible to prove the character of a person, are admissible for other purposes, such as proof of knowledge.  What we have here are not mere isolated events or mere statistics of the number of complaints.  On the contrary, the plaintiff offered in evidence a series of actual written civilian complaints of similar nature, most of them before and some after the Beck incident, containing specific information pertaining to the use of excessive force and verbal abuse by Officer Williams.  All but one of the complaints had been investigated by OPS and had been transmitted through the police department chain of command to the Chief of Police.  Thus, he had knowledge of the complaints.  But, under the sterile and shallow OPS system of investigation, each complaint was insulated from other prior and similar complaints and treated in a vacuum.

The testimony of witnesses to some of these incidents was rendered weightless by OPS in its disposition of the complaints merely because the witnesses had accompanied the complainant at the time of the incident.  OPS appears to have assumed the credibility of Officer Williams's response, even though it recognized that "an officer's credibility is at issue when a

discernable pattern of complaints develop. [sic]"  (See infra OPS
1991 report)  OPS appears to have attached no credibility,
however, to the complainant's witnesses if they accompanied the
complainant at the time of the incident, even if an OPS
investigator found them believable.  (See supra Yancey report)
In the absence of testimony by witnesses having no connection
with the alleged incident, OPS ultimately resolved almost all
complaints against Williams or other officers on the narrow
testimony of the complainant and the accused officer, thereby
disposing of them unfavorably for the complaining citizen.  OPS
did not consider prior citizen complaints of an officer's
excessive use of force as relevant in assessing a pending
complaint, and manifested no interest in probing the credibility
of the officer under investigation.  Thus, it "did not report
patterns of cases to the police bureau."

Without more, these written complaints were sufficient for
a reasonable jury to infer that the Chief of Police of Pittsburgh
and his department knew, or should have known, of Officer
Williams's violent behavior in arresting citizens, even when the
arrestee behaved peacefully, in orderly fashion, complied with
all of the Officer's demands, and offered no resistance.

Because the complaints, especially those during the year
1991, came in a narrow period of time and were of similar nature,
a reasonable jury could have inferred that the Chief of Police
knew, or should have known, of Williams's propensity for violence
when making arrests.  See Parrish v. Luckie, 963 F.2d 201, 205
(8th Cir. 1992).  Three of the 1991 complaints were filed between
April and July.

We reject the district court's suggestion that mere
Department procedures to receive and investigate complaints
shield the City from liability.  It is not enough that an
investigative process be in place; as Beck's brief to us notes:

> The investigative process must be real.  It must have
> some teeth.  It must answer to the citizen by providing
> at least a rudimentary chance of redress when injustice
> is done.  The mere fact of investigation for the sake
> of investigation does not fulfill a city's obligation
> to its citizens.

None of the cases cited by the district court at trial
support its conclusion that Beck's claim is barred simply because
the City investigated his complaint, regardless of the adequacy
of the investigation.  In Brandon v. Hart, the Supreme Court
mentions that twenty complaints were filed against the officer
whose behavior precipitated the suit in that case, 469 U.S. 464,
466 n.3 (1985), but there is no discussion as to whether or not
the Police Department had investigated those complaints.  In
Harris v. City of Pagedale, 821 F.2d 499 (8th Cir. 1987), cert.denied 484
U.S. 986 (1987), not only were there numerous
complaints filed against the accused officer which were
investigated, but in addition the officer was suspended for two
days as the result of one of the complaints.  Id. at 502.  There
is no discussion of the City's procedures for handling complaints
in Parker v. District of Columbia, 850 F.2d 708 (D.C. Cir. 1988),

cert. denied, 489 U.S. 1065 (1989).  We did note in Bieleviczthat the
City-defendant in that case "followed an express policy
of not investigating--or even accepting--complaints regarding
alleged pretextual arrests" under a charge of public drunkenness,
915 F.2d at 849, but we never suggested that this was a
requirement for a successful  1983 claim.  See also Fletcher,
867 F.2d 791; Herrera v. Valentine, 653 F.2d 1220 (8th Cir.
1981).

There are, on the other hand, very sound reasons to reject
the rule that the district court implicitly suggests.  Formalism
is often the last refuge of scoundrels; history teaches us that
the most tyrannical regimes, from Pinochet's Chile to Stalin's
Soviet Union, are theoretically those with the most developed
legal procedures.  The point is obviously not to tar the Police
Department's good name with disreputable associations, but only
to illustrate that we cannot look to the mere existence of
superficial grievance procedures as a guarantee that citizens'
constitutional liberties are secure.  Protection of citizens'
rights and liberties depends upon the substance of the OPS
investigatory procedures.  Whether those procedures had substance
was for the jury's consideration.

On reviewing the record, we find considerably more than
Beck's complaints from which a reasonable jury could have found
that the City's procedures are inadequate to protect civilians
from police misuse of force.  The OPS itself was structured to
curtail disciplinary action and stifle investigations into the
credibility of the City's police officers.  Even if complainant's
witnesses were credible, their testimony became inert under OPS
policy, while at the same time police officers' statements
appeared to have been given special, favorable consideration.  A
jury readily could have found the Office of Professional
Standards was nothing more than a facade to cover the violent
behavioral patterns of police officers under investigation, to
protect them from disciplinary action, and thereby perpetuate the
City's custom of acquiescing in the excessive use of force by its
police officers.

Because there is no formalized tracking of complaints for
individual officers, a jury could find that officers are
guaranteed repeated impunity, so long as they do not put
themselves in a position to be observed by someone other than
another police officer.  As we noted in Bielevicz, "it is logical
to assume that continued official tolerance of repeated
misconduct facilitates similar unlawful actions in the future."
915 F.2d at 851.

Further, a jury would have had the benefit of OPS's 1991
year-end report, which OPS had circulated to police department
officials and which Beck introduced into evidence.  The 1991 OPS
report brought to light several of the problems to which Beck
refers.  It recognized that the department had a problem with
police use of excessive force, and that the procedures in place
may be inadequate to respond to the problem. ("Use of force has
been an issue in the past.  Actual discipline for excessive force
is very low.").  It acknowledged that many complaints were
effectively dismissed because no independent witness was at the

scene to observe the encounter. ("Most cases cannot be sustained because it is usually the officer and complainant on the scene only; and no neutral evidence is available."). And it conceded that repeated complaints against one officer may be cause for concern and some uncertainty as to that officer's veracity. ("The officer's credibility is at issue when a discernable pattern of complaints develop [sic]."). The report also suggested that better procedures "would certainly identify points for retraining, and officers typically engaged in this behavior."

Gedman testified that the City took no action subsequent to the 1991 report. The 1994 report showed that OPS had received 34 complaints of police officer violence during the year 1991, none of which had resulted in disciplinary action. OPS statistics for 1992 and 1993 showed 39 and 38 civilian complaints of excessive police officer force respectively, and in 1994, an increase to 77 complaints.

The City cites Bryant v. Whalen, 759 F. Supp. 410 (N.D.Ill. 1991) for the proposition that statistical information alone is insufficient to support a 1983 claim. In Bryant, the City of Chicago had a system similar to Pittsburgh's to investigate the use of excessive force by its police officers with an office, OPS, to do the investigation. OPS would determine if the complaint was "unfounded," "exonerated," "not sustained," or "sustained." It used a preponderance of the evidence standard of proof, which mandated a "not sustained" verdict if the evidence presented the OPS with only the complainant's word against the officer's word.

The plaintiffs alleged that several of Chicago's police officers assaulted them, and that these officers each had an extensive prior complaint history. One of the officers had 39 prior complaints of excessive use of force, none of which the OPS sustained. The plaintiffs presented statistical evidence revealing that the OPS sustains 6.2% of complaints per year. Id.at 421. They asserted that the low percentage of sustained complaints, and the repeated allegations against the defendant police officers, proved that the City showed deliberate indifference to the constitutional rights of its citizens.

The district court in Bryant held that statistics alone of unsustained complaints of excessive use of force, without evidence that those complaints had merit, will not suffice to establish municipal liability under 1983. Id. at 424. See also Strauss v. City of Chicago, 760 F.2d 765, 768-69 (7th Cir. 1985) (finding statistics insufficient to prove municipal liability because people may file complaints "for many reasons, or for no reason at all.")

Bryant, even if it were precedential and/or persuasive, is distinguishable from the instant case. Beck presented considerably more than mere statistics. He also presented evidence of actual written civilian complaints. Further, he presented evidence that the City of Pittsburgh has no formal system in place for tracking complaints against its officers and that the citizen complaints were not isolated incidents.

Finally, in a colloquy with counsel, the trial court indicated that the absence of expert testimony to support

plaintiff's case was a factor that influenced its decision to enter judgment as a matter of law.  To the extent that Gedman herself brought to light deficiencies in her own department's procedures, we see little need for the use of expert testimony to confirm her own insights.  As for drawing inferences from the evidence regarding the adequacy of the investigatory process, we again agree with Beck that "[t]o require expert testimony to prove this fact is ridiculous.  It is not beyond the ken of an average juror to assess what a reasonable municipal policymaker would have done with the information in this case."

IV.

In sum, we draw no conclusion as to whether the evidence presented by Beck supports a determination that Pittsburgh policymakers knew about and acquiesced in a custom that tolerated the use of excessive force by officers of the Police Department. We do conclude, however, that Beck presented sufficient evidence from which a reasonable jury could have inferred that the City of Pittsburgh knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers.  This evidence sufficiently precluded the entry of judgment as a matter of law by the district court.

Accordingly, the judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion.

Costs taxed against the City of Pittsburgh, appellee.