Theresa A. DINTINO, et al., Plaintiffs,

v.

John ECHOLS, et al., Defendants.

No. CIV.A. 01–3574.

United States District Court,
E.D. Pennsylvania.

Jan. 28, 2003.

Paul Hetznecer, Hetznecker & Meehan, Philadelphia, PA, for Plaintiffs.

Edward D. Chew, Jr., Deputy City Solicitor City Law Dept., Philadelphia, PA, for Defendants.

---

1. Plaintiff's employment responsibilities consisted primarily of typing written reports pre-

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Theresa A. Dintino ("plaintiff") filed a complaint against Lt. John Echols, Deputy Commissioner John Norris and the Philadelphia Police Department alleging a number of federal and state causes of action arising from plaintiff's arrest on July 20, 1999. Each cause of action brought by the plaintiff is based upon plaintiff's allegation that Lt. Echols, a Philadelphia police officer, arrested her without probable cause. Under the undisputed facts of this case, the court concludes that no reasonable jury could find that Lt. Echols lacked probable cause to arrest the plaintiff, or that, with reckless disregard for the truth, he omitted a material fact from the affidavit of probable cause or made a false statement therein. Since Lt. Echols's conduct did not violate the plaintiff's constitutional rights, or Pennsylvania Law, summary judgment in favor of the defendants on all counts is appropriate.

## I. BACKGROUND

### A. *The Underlying Criminal Proceeding*

Prior to the events giving rise to the instant litigation, the plaintiff had been employed as a civilian employee of the Philadelphia Police Department ("police department" or "department") for approximately twenty-six years. Plaintiff spent twenty of those twenty-six years, and all periods relevant hereto, working as a clerk typist in the criminalistics laboratory ("crime lab").[1] In the fall of 1998, the department authorized a fixed number of overtime-hours to be allotted among crime lab employees on a voluntary basis. Plain-

pared by chemists and technicians.

tiff regularly requested, and was afforded, overtime-hours.

On January 6, 1999, Lieutenant John Echols ("Echols"), a Philadelphia police officer assigned to the Internal Affairs Unit, received an anonymous letter alleging that the plaintiff was unlawfully receiving overtime pay. Specifically, the letter alleged that on a number of occasions when the plaintiff was scheduled for and earning overtime, she was not present in the crime lab, but instead, was either at her home or working at a second job as an aerobics instructor at Saint Agnes Hospital's Wellness Center in Philadelphia, Pennsylvania (the "hospital"). The letter further alleged that in 1998, plaintiff was scheduled and paid for having worked overtime on ninety-five (95) days of that year, but that on forty-five (45) of those days, the plaintiff taught aerobics at the hospital during the same hours for which she had collected overtime from the department.

After receiving the letter, Lt. Echols commenced an investigation into the allegations contained therein. As part of the investigation, Lt. Echols contacted the hospital and confirmed plaintiff's employment there. Lt. Echols also compared the hospital's employment records with the records of the police department. Through this comparison, Lt. Echols uncovered that between January 7, 1998 and March 24, 1999, there were fifty-three (53) occasions in which plaintiff was signed-in at the hospital (to teach aerobics) while, at the same time, being scheduled and paid for working overtime with the police department.

The investigation continued and on February 2 and 3, 1999, through surveillance, plaintiff was observed either at home or at the hospital (teaching aerobics) during the same time periods for which she was earning overtime with the police department. Additionally, between April 15 and May 19, 1999, Lt. Echols interviewed ten individuals who worked with plaintiff at the crime lab, who provided corroboration to the accusations made in the anonymous letter.[2]

On or about July 15, 1999, Lt. Echols summarized his findings from the investigation in an Affidavit of Probable Cause, and, in accordance with City of Philadelphia Police Department procedure, submitted it, along with supporting documents, to the Philadelphia County District Attorney's Office, which approved Lt. Echols's request to seek an arrest warrant.

---

2. First Lt. Echols interviewed crime lab civilian supervisors Joseph McBride and Lewis Brenner. McBride and Brenner both stated: 1) that they were the plaintiff's direct supervisors (during their respective shifts); 2) that plaintiff had been approved to work overtime; 3) that while earning overtime, crime lab employees must be present in the crime lab building; 4) that the plaintiff was never authorized to work at home, or be anywhere other than the crime lab, while earning overtime; 5) that the plaintiff was never authorized to work for the hospital, or anyone else for that matter, while earning overtime with the department; 6) that they were unaware that plaintiff was also employed by the hospital; 7) that they were unaware that plaintiff worked at the hospital during the same hours for which she was earning overtime from the department; and 8) that there were no civilian supervisors on duty between the hours of 4:00 p.m. and 12:00 a.m. (which represent the hours in which plaintiff allegedly left the crime lab while earning overtime). Both interviews were transcribed and signed by the interviewees, and both, Brenner and McBride, acknowledged making these statements at their respective deposition.

Lt. Echols also interviewed eight of the plaintiff's non-supervisory coworkers. The information obtained from the respective interviews of these individuals corroborated the statements of Brenner and McBride, and was consistent with the accusations made in the anonymous letter. During these interviews, Lt. Echols was also made aware that plaintiff's hours were entered into the department's payroll records by other crime lab employees, and not by plaintiff.

On July 20, 1999, Lt. Echols interviewed the plaintiff. After being advised of her Miranda rights, however, plaintiff declined to continue the interview. Based on the affidavit and supporting documents prepared by Lt. Echols, an arrest warrant was issued by a Philadelphia judicial officer and plaintiff was arrested (essentially for the theft of approximately four thousand, five hundred dollars ($4,500) in overtime wages) and charged with felony Theft, Theft by Deception, Receiving Stolen Property, Tampering with Public Records or Information, Securing Documents by Deception and Unsworn Falsification to Authorities.

On May 22, 2000, the plaintiff was found not guilty of all charges by a Philadelphia Court of Common Pleas judge sitting without a jury.[3]

## B. *The Instant Action*

Following her acquittal at trial, the plaintiff and her husband filed the instant action against Deputy Commissioner John Norris,[4] Lt. Echols (collectively "individual defendants") and the City of Philadelphia (the "City"). The complaint contained the following allegations: 1) *COUNT I:* that the individual defendants lacked probable cause to arrest, and that arresting plaintiff in the absence of probable cause constitutes unlawful seizure, false arrest, malicious prosecution and illegal imprisonment, all in violation of the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1893 ("Section 1983"); 2) *COUNT II:* that the City acted with deliberate indifference in failing to train Lt. Echols and that such failure resulted in the violation of plaintiff's constitutional rights as complained of in Count I, and is, therefore, actionable under Section 1983; 3) *Count III:* that as a result of their acts and omissions, the defendants are liable to plaintiff, under Pennsylvania tort law, for false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, outrageous conduct, negligence and gross negligence;[5] and 4) *Count IV:* that by reason of the acts and conduct of the defendants, plaintiff's husband has suffered from Loss of Consortium.

## C. *Plaintiff's Argument*

The gist of plaintiff's claim is that because of the City's failure to train Lt. Echols adequately, he conducted a flawed and incomplete investigation into the accusations made in the anonymous letter, and that as a result, his judgment that there was probable cause to arrest the plaintiff was in error. Specifically, the plaintiff contends that Lt. Echols's investigation fell short with regards to the collection and analysis of the department's personnel rec-

3. The plaintiff defended against these charges by alleging that although she was not working at the crime lab during the hours indicated in the department's personnel records, she would make-up the hours missed at times for which she was not scheduled to work and not paid. *See infra* note 8. In May, 2001, the plaintiff returned to work with the crime lab.

4. With regards to all causes of action against Deputy Commissioner Norris, the plaintiff has conceded, in her response to defendants' motion for summary judgment, that there is no evidence of Deputy Commissioner Norris's knowledge of or involvement in the investiga-

tion and subsequent arrest of plaintiff, and that therefore, summary judgment with respect to all claims against Deputy Commissioner Norris is appropriate.

5. As previously stated, plaintiff has agreed that all claims against deputy Commissioner Norris should be dismissed summarily. The plaintiff further concedes that under the Political Subdivision Tort Claims Act, 42 PA. Cons. Stat. §§ 8541–64, the claims contained in Count III cannot be brought against the City, and ·should therefore, also be dismissed on summary judgment.

ords, and the scope of the surveillance and interviews conducted.

In support of her claim, plaintiff asserts that Lt. Echols examined only the computer-generated Daily Attendance Reports ("DAR") and not the daily time sheets, that Lt. Echols knew that the plaintiff did not enter her own hours into the DAR,[6] and that the computer program used by the crime lab for recording hours worked, is only able to record straight time.[7] Thus, while the DAR accurately reflects the *number* of hours worked, only the daily time sheets would accurately reflect the *actual hours* worked. Accordingly, the plaintiff contends that Lt. Echols should have examined the daily time sheets, and that had Lt. Echols done so, he would have determined that although the DAR did not accurately reflect the *particular* hours worked by plaintiff, they did accurately reflect the *number* of hours worked, and that therefore, at the moment of the arrest, there was no probable cause to believe that plaintiff was illegally collecting overtime.

With regards to the scope of the surveillance, plaintiff contends, and the defendants do not contest, that surveillance of the plaintiff was only conducted between the hours of approximately 4:00 p.m. and 8:00 p.m.[8] Plaintiff further contends that had the surveillance continued through a later hour, plaintiff would have been observed returning to work to make-up the lost time and that Lt. Echols would have determined that, at the moment of the arrest, there was no probable cause to believe that plaintiff was illegally collecting overtime.

Finally, with regards to the interviews conducted, it is uncontested that Lt. Echols failed to ask any of the plaintiff's coworkers or supervisors how time was kept and recorded in the DAR, or whether they, the plaintiff or any other crime lab employee regularly left work during his or her scheduled hours and then returned to work at some point thereafter to make-up the time. Plaintiff alleges that had defendant Echols made such inquiries or interviewed certain crime lab employees that were present when she would return to

**6.** Instead, plaintiff submitted her hours on handwritten daily time sheets. The information contained within plaintiff's time sheets was then entered into the DAR by other crime lab employees.

**7.** In other words, if an employee was scheduled to work from 9:00 a.m to 5:00 p.m., but took a two hour break from 1:00 p.m. to 3:00 p.m., the computer program used by the crime lab could not account for the resulting two hour gap. Thus, in order to properly record the *number* of hours worked in a given day, one would either have to "clock-out" at 3:00 p.m., or alternatively, "clock-out" at 5:00 p.m., but work until 7:00p.m. The plaintiff contends that this resulted in somewhat of an "honor system" for recording time in the DAR, and that the actual hours worked would have appeared on pre-printed daily time sheets, or sign-in sheets, upon which crime lab employees would indicate a "time-in" and a "time-out." Curiously, none of these time sheets have been provided to the court. None-

theless, drawing all inferences in favor of the plaintiff, as the non-moving party, the court will assume that had Lt. Echols examined the time sheets, he would have realized that the defendant was not illegally receiving overtime pay.

**8.** As a result of this admittedly limited surveillance, however, the plaintiff was observed, on February 2, 1999, leaving the crime lab at 5:10 p.m. As of 7:50 p.m. plaintiff had not returned to the crime lab, and at 8:10 p.m., plaintiff's car was observed parked outside of her residence. On the same night, plaintiff claimed five (5) hours of overtime, which according to the DAR were to have been completed between 5:45p.m. and 10:45 p.m. On the following day, the plaintiff was also observed leaving the crime lab at 5:10 p.m. and proceeding towards the hospital where she taught aerobics. On that night, plaintiff claimed six hours of overtime, which according to the DAR, were to have been completed between 5:45 p.m. and 11:45 p.m.

make-up the hours for which she was paid, he would have determined that the plaintiff was, in fact, working at the crime lab for the amount of overtime hours for which she paid, and that therefore, there was no probable cause to believe that plaintiff was illegally collecting overtime.

## II. DISCUSSION

### A. *Summary Judgment Standard*

A court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" only if its existence or nonexistence would affect outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" only when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. *Id.* In determining whether there exist genuine issues of material fact, all inferences must be drawn, and all doubts must be resolved, in favor of the non-moving party. *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 305–06 (3d Cir. 2001) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

Although the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, in a case such as this, where the non-moving party is the plaintiff, and therefore, bears the burden of proof at trial, that party must present affirmative evidence sufficient to establish the existence of each element of his case. *Id.* at 306, 106 S.Ct. 2505 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Accordingly, in order to sur-vive summary judgment, the non-moving party must adduce more than a "mere scintilla" of evidence in its favor. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir.2002). On the other hand, the court is "not permitted to weigh the evidence or substitute [its] own conclusions for [those] of the factfinder." *Id.* Thus, summary judgment is appropriate only if the court finds that the record "could not lead a rational trier of fact to find for the nonmoving party...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538, (1986); *see Orsatti v. New Jersey State Police*, 71 F.3d 480, 486 (3d Cir.1995) (granting summary judgment for the defendants on the basis that no reasonable jury could find that defendants were objectively unreasonable in concluding that they had probable cause to believe that the plaintiff's conduct constituted a crime).

### B. Count I: Plaintiff's Rights under the Fourth and *Fourteenth Amendments*

■ To establish a claim under Section 1983, the plaintiff must show that Lt. Echols, acting under color of state law, deprived her of a right or privilege secured by the Constitution or laws of the United States. *Williams v. Borough of West Chester*, 891 F.2d 458, 464 (3d Cir.1990). The parties agree that at all times relevant hereto, Lt. Echols was acting under color of state law. Accordingly, the only question that remains is whether Lt. Echols's actions (i.e., arresting plaintiff) deprived the plaintiff of a federal right. As previously stated, the plaintiff alleges that Lt. Echols arrested her without probable cause and that as a result, he violated plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

■ As an initial matter, the court finds that plaintiff's claims for arrest without

probable cause against Lt. Echols must be dismissed to the extent that they are brought under the Fourteenth Amendment. As stated by the Supreme Court in *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, [and] not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* (internal quotations and citations omitted). The Fourth Amendment provides an explicit textual source of constitutional protection against arrest without probable cause. *See* U.S. CONST. AMEND. IV; *Oliver*, 510 U.S. at 274, 114 S.Ct. 807. In the instant matter, the plaintiff's claims arise from her allegations that Lt. Echols arrested her without probable cause. Therefore, only the Fourth Amendment may serve as "the guide for analyzing these claims." *Oliver*, 510 U.S. at 273, 114 S.Ct. 807. Accordingly, the plaintiff's claims must be dismissed to the extent that they are brought under the Fourteenth Amendment.

▇▇▇▇ The Fourth Amendment to the United States Constitution prohibits arrest without probable cause. *Orsatti*, 71 F.3d at 482. Specifically, the Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

U.S. CONST. AMEND. IV. Probable cause to arrest exists when, "the facts and [the totality. of] circumstances within the arresting officer's knowledge [at the time of the arrest] are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 483; *see Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 789 (3d Cir.2000) (noting that the Third Circuit follows a totality of circumstances approach in assessing the existence of probable cause and that the relevant time in determining the existence of probable cause is the time at which the arrest was made); *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir.1997) (stating that the relevant time for determining whether probable cause existed is the time at which the arrest was made). Although generally, the existence of probable cause in a Section 1983 action is a question for the trier of fact, "a district court may conclude 'that probable cause exists as a matter of law if the evidence, viewed [in the light] most favorabl[e] to the [p]laintiff,'" could not support a contrary finding, and the court "may enter summary judgment accordingly." *Merkle*, 211 F.3d at 788–89 (citing *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir.1998); *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir.1997); *Sharrar*, 128 F.3d at 818; *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 190–92 (3d Cir.1984)).

▇▇▇▇ Fourth Amendment jurisprudence teaches that under Section 1983, challenges to the arresting officer's determination of probable cause, when an arrest is made pursuant to a warrant issued by an independent magistrate, involve not only the legal sufficiency of the affidavit presented to the independent magistrate, but also the veracity of the affiant.[9] *See*

---

9. Although, in the criminal setting, substantial deference is generally afforded to an independent magistrate's prior finding of probable cause, when an individual challenges the existence of probable cause at the time of the arrest in a civil action brought under Section

*Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). First, the plaintiff may succeed by demonstrating that the facts and circumstances within the arresting officer's knowledge at the time of the arrest were not sufficient to warrant a reasonable person to believe that a crime has been (or is being) committed by the person being arrested. *Orsatti,* 71 F.3d at 483. This is an objective test, which ultimately goes to the facial sufficiency of the affidavit of probable cause presented to the independent magistrate. Second, if the affidavit is legally sufficient on its face, a challenge to the affiant's veracity may, nonetheless, succeed if the plaintiff can show that the affiant "1) knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions in his affidavit of probable cause that create a falsehood in applying for an arrest warrant; and 2) such statements or omissions are material to the finding of probable cause." *Merkle,* 211 F.3d at 790. The second prong is subjective, to the extent that it inquires into what this officer knew, when he knew it, and what he chose to disclose to the independent magistrate in the probable cause affidavit.

■ As to the first prong, the legal sufficiency of the affidavit of probable cause, the court concludes that, at the time of the plaintiff's arrest, the facts and circumstances within Lt. Echols's knowledge were sufficient to warrant a reasonable person to believe that the plaintiff had fraudulently received overtime wages from the department, and no rational trier of fact could find otherwise.

One, Lt. Echols was advised of the plaintiff's conduct through a detailed letter, albeit anonymous, which set forth the accusations against plaintiff.

Two, Lt. Echols compared the hospital's personnel records to the department's payroll records and found that on fifty-three (53) separate occasions, the plaintiff had signed-in to teach aerobics at the hospital during periods for which the department's records reflected that she was earning overtime. Thus, the employment records examined by Echols corroborated the accusations set forth in the letter.[10] *See Merkle,* 211 F.3d at 789–90 (reliance on corroborative evidence supports a finding of probable cause).

Three, Lt. Echols conducted ten (10) interviews with the plaintiff's supervisors and coworkers. Lt. Echols asked the plaintiff's primary supervisor, Lewis Brenner, whether employees earning overtime had to work in the crime lab building "the entire time," and was told that "[t]hey must work in the building." When asked if he was aware that plaintiff had gone home and/or to another job while earning overtime, plaintiff's supervisor responded that he was not. In fact, Brenner stated that he did not even know that the plaintiff had a second job. Additionally, Brenner stated that the plaintiff had no authorization or special permission to work at home or teach aerobics while earning overtime with the department. Finally, at the con-

1983, courts are required to make an independent finding as to the existence of probable cause, without deference to the conclusions of the magistrate judge who issued the arrest warrant. *See Merkle,* 211 F.3d at 789.

**10.** Furthermore, the anonymous letter alleged that the plaintiff worked at the hospital, while concurrently earning department overtime, on Mondays and Wednesdays. Lt. Echols's

comparison of the employment records show only three occasions on which the plaintiff signed-in at the hospital, while earning department overtime, on any other day. Such factual consistencies between the allegations of an informant and other corroborative evidence supports the reasonableness of Lt. Echols's belief that the anonymous letter was reliable.

clusion of the interview, in which the questions asked by Lt. Echols made clear what the accusations against the plaintiff were, Brenner was asked, "[i]s there anything you can add to aid in this investigation," to which Brenner responded, "no."

Four, Lt. Echols conducted interviews of eight other crime lab employees, two of whom shared the responsibility of entering each employee's hours into the DAR. During the interviews of these two individuals, Lt. Echols was told, by each, that the information entered into the DAR for each employee is obtained from the respective employee's daily time sheets. All eight of plaintiff's coworkers who were interviewed indicated that they were unaware that the plaintiff was leaving the crime lab while earning overtime-pay from the City. These individuals were also asked whether they had any other information that would assist the police with the investigation. Each and every interviewee answered, "no" to this question.[11]

Five, as a result of the above interviews, Lt. Echols learned that there were no supervisors on duty during the time periods in which the plaintiff had left the crime lab while earning overtime. The fact that the plaintiff only left the crime lab at times during which she was unsupervised further supports the reasonableness of Lt. Echols's belief that the plaintiff was unlawfully earning overtime.

Finally, Lt. Echols conducted surveillance on the plaintiff, during which he observed the plaintiff leaving work, at her home, or otherwise not present at the crime lab, at times when the DAR reflected that she was earning overtime.

Based on the investigation conducted by Lt. Echols, the following facts were of

record at the time of the arrest: 1) between January 7, 1998 and March 24, 1999, there were fifty-three (53) occasions in which the plaintiff had signed-in to teach aerobics at the hospital while simultaneously signed-in for overtime-work with the department; 2) the plaintiff was observed leaving the crime lab and at home during periods for which she was signed-in to work overtime with the department; 3) the plaintiff was required to be present at the crime lab while earning overtime; 4) there were no supervisors on duty at the crime lab for the "shifts" during which the plaintiff was suspected to be fraudulently earning overtime; and 5) the plaintiff's supervisors were unaware that the plaintiff had a second job. Based on these facts and circumstances, the court finds that a reasonable person would have concluded that there was probable cause to arrest the plaintiff.

Plaintiff claims, however, that Lt. Echols's investigation was flawed and incomplete. According to the plaintiff, had Lt. Echols conducted a proper and thorough investigation, beyond that which he carried out, the investigation would have undermined the probable cause calculus in a material way. The court disagrees.

■ First, once a law enforcement official has sufficient evidence within his knowledge to establish probable cause, no further investigation is required, and the likely result of any additional investigation that could have been conducted is irrelevant. *See Merkle*, 211 F.3d at 790 n. 8 (a police officer is "not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed"); *see also Vazquez v.*

---

11. It is clear from the interviews that those being questioned were fully aware of the allegations against the plaintiff. The interviewer repeatedly referred to the allegations, and a number of those questioned were asked if they had heard rumors of the allegations. Nonetheless, when asked to provide Lt. Echols with any other pertinent information, none of the interviewees did so.

*Rossnagle,* 31 Fed.Appx. 778, 779 (3d Cir. 2002) ("once [the police officer] had established that there was sufficient probable cause to arrest [plaintiff], there was no need for additional investigations"); *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d cir.1997) ("[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest"). Thus, once Lt. Echols's determined that there was probable cause to arrest, there was no duty on his part to exhaust every possible investigatory avenue or to negate every possible theory that may have exculpated the plaintiff.

Second, the plaintiff does not appear to contend that Lt. Echols made any knowing or deliberate misrepresentations.[12] Instead, the plaintiff contends that Lt. Echols was on somewhat of a "witch-hunt," for whatever reason, and accordingly, acted with reckless disregard for the truth when he failed to: 1) examine plaintiff's daily time sheets in conjunction with the DARs; 2) conduct additional surveillance; 3) ask any of the plaintiff's coworkers or supervisors how time was kept and recorded in the DAR, or whether they, the plaintiff or any other crime lab employee regularly left work during his or her scheduled hours and then returned to work at some point thereafter to make-up the time.[13] This argument requires that the court address what Lt. Echols knew, when he knew it and what he chose to disclose to the independent magistrate.

With regards to Lt. Echols's failure to examine the daily time sheets, it is uncontested that Brian Pfleegor and Louis Szojka, the crime lab employees responsible for entering plaintiff's hours into the DAR, told Lt. Echols that the information they enter in the DAR is obtained from each individual employee's daily time sheet. Therefore, it was reasonable under the circumstances then present for Lt. Echols to believe that he could rely on the statements of these individuals and that an examination of the time sheets would have been unnecessary, superfluous and duplicative. Accordingly, the court finds that, under the uncontested facts, viewed in the light most favorable to the plaintiff, no rationale trier of fact could find that Lt. Echols acted with reckless disregard for the truth by failing to examine the daily time sheets.

With regards to Lt. Echols's failure to conduct a more extended surveillance of the plaintiff, the plaintiff asserts that had the surveillance of plaintiff extended past 8:00 p.m., Lt. Echols would have observed the plaintiff returning to work to make-up the hours she missed while away from the crime lab. The decision to temporally restrict the surveillance would, at worst, constitute evidence of a negligent or sloppy investigation. It does not, however, rise to the level of culpability associated with the term "reckless disregard." Absent evidence of wrongdoing or bad faith, of which the plaintiff presents none, it is not the province of the court to second-guess the investigatory techniques used and deci-

---

**12.** The plaintiff has presented no evidence that would tend to show that Lt. Echols was aware that the plaintiff returned to the crime lab, after her scheduled overtime-hours, to make-up the hours she missed while at home or teaching aerobics.

**13.** For the purpose of this opinion and resolving all doubts in favor of plaintiff, the court finds that had Lt. Echols's investigation included any of the above procedures, he would have discovered information that would have created a genuine issue of material fact as to whether or not he had probable cause to arrest. However, because the plaintiff cannot show a reckless disregard for the truth on the part of Lt. Echols, this finding would not alter the disposition of plaintiff's claims.

sions made by law enforcement officials. Accordingly, the court finds that, under the uncontested facts present here, viewed in the light most favorable to the plaintiff, no rational fact-finder could conclude that Lt. Echols acted with reckless disregard for the truth when he limited his surveillance of the plaintiff to between the hours of 4:00 and 8:00 p.m.

 Finally, with regards to the scope of the interviews conducted, the plaintiff alleges that had Lt. Echols asked how time was kept and recorded in the DAR, or how employees made-up missed time,[14] he would have realized that the plaintiff was "making-up" missed overtime-hours by returning to the crime lab after her scheduled shifts had ended. The relevant time period to all issues concerning the existence of probable cause, is the time at which the arrest was made. *See Merkle,* 211 F.3d at 789; *Sharrar,* 128 F.3d at 818. Accordingly, Lt. Echols cannot be charged with the benefit of hindsight. At the time the interviews were conducted, the interviewees were made well aware of the allegations against the plaintiff. They were also asked numerous questions which gave them the opportunity to explain how time was recorded in the DAR. Particularly, at the conclusion of each interview, each interviewee was asked if there was "anything [they could] add to aid in [the] investigation." None of the ten (10) individuals interviewed responded affirmatively. Once again, absent evidence of wrongdoing or bad faith, of which the plaintiff presents none, it is not the province of the court to second-guess the investigatory procedures used and decisions made by law enforcement officials, or to make conjecture as to what would have been the proper question to ask or a better way to phrase a question by an investigator. Accordingly, the court finds that, under the facts present here, viewed in the light most favorable to the plaintiff, no rational fact-finder could conclude that Lt. Echols acted with reckless disregard for the truth by failing to ask the specific inquiries proffered by the plaintiff.

The court, therefore, concludes that the defendants having presented substantial evidence of probable cause and the plaintiff having failed to present sufficient evidence to demonstrate that Lt. Echols acted with reckless disregard for the truth, no rational trier of fact could find that Lt. Echols lacked probable cause to arrest the plaintiff. Accordingly, summary judgment will be entered in favor of the defendant as to Count I.

## C. Plaintiff's Remaining Allegations: Counts II, III and *IV*

The court having concluded that, as a matter of law, Lt. Echols had probable cause to arrest, summary judgment is appropriate as to all of the plaintiff's remaining claims.

### 1. *Failure to train against the City*

 In Count II of the plaintiff's complaint, the plaintiff alleges a failure to train claim against the City under Section 1983. To establish liability on the part of a municipality for failure to train police officers, the plaintiff must demonstrate that in the execution of an official or unofficial policy or custom, the municipality acted with deliberate indifference towards the plaintiff's constitutional rights, and that such deliberate indifference resulted in a violation thereof. *See Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Beck v. City of Pittsburgh,* 89 F.3d 966, 971–72 (3d Cir.1996). Although, under Section 1983, "[i]t is possible for a municipality to be held independently lia-

14. *See supra* note 7.

ble for a [constitutional] violation even in situations where none of its employees are liable," there can be no municipal liability unless there is a violation of the plaintiff's constitutional rights. *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.,* 318 F.3d 473, 482 (3d Cir.2003) (*citing Fagan v. City of Vineland,* 22 F.3d 1283, 1292 (3d Cir.1994)) (a municipality can be liable under section 1983 and the Fourteenth Amendment for failure to train its police officers with respect to high speed automobile chases, even if no individual officer participating in the chase violated the Constitution); *Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (emphasizing "the separate character of the inquiry into the question of municipal responsibility and the question of whether a constitutional violation occurred,").

In this case, as discussed above, the court has concluded, as a matter of law, that the plaintiff's constitutional right not to be arrested without probable cause was not violated. Therefore, there having been no violation of plaintiff's constitutional rights, there can be no municipal liability for failure to train under Section 1983.[15] Accordingly, summary judgment will be entered in favor of the defendants as to Count II.

### 2. *Plaintiff's state law claims against Lt. Echols*

In Count III of the complaint, the plaintiff asserts various claims under Pennsylvania tort law against Lt. Echols. Each of plaintiff's state law claims is addressed below, separately, *in seriatim.*

■ The plaintiff alleges that as a result of the aforementioned conduct on the part of Lt. Echols, he is liable, under Pennsylvania tort law, for false imprisonment, false arrest and malicious prosecution. Under Pennsylvania law, in order to succeed on any one of these claims, the plaintiff must establish that the defendant officer lacked probable cause to arrest. *See Olender v. Township of Bensalem,* 32 F.Supp.2d 775, 791 (E.D.Pa.1999) (false arrest and false imprisonment are treated as the same claim, as they both describe the same conduct); *Gilbert v. Feld,* 842 F.Supp. 803, 814, 821 (E.D.Pa.1993) (in order to succeed on claims of malicious prosecution and false arrest, the plaintiff must show that the defendant lacked probable cause). In the case at bar, the court has concluded that Lt. Echols had probable cause to arrest the plaintiff. Accordingly, plaintiff's claims for false imprisonment, false arrest and malicious prosecution must fail.

■ The plaintiff further alleges that as a result of defendant Echols's conduct, he is liable to plaintiff, under Pennsylvania tort law for intentional infliction of emotional distress and outrageous conduct. In order to succeed on a claim of intentional infliction of emotional distress or outrageous conduct, the plaintiff must prove that the defendant's conduct was extreme and outrageous and that, as a result, she suffered damages. *See Hunger v. Grand Cent. Sanitation,* 447 Pa.Super. 575, 670 A.2d 173, 177 (Pa.Super.1996). In this case, the court has concluded, as a matter of law, that Lt. Echols had probable cause to arrest plaintiff, and therefore,

**15.** Assuming *arguendo* that Lt. Echols's conduct had violated the plaintiff's Fourth Amendment rights, plaintiff's failure to train claim against the City would fail nonetheless because she has failed to adduce evidence sufficient to establish that Lt. Echols's conduct was proximately caused by a policy or custom on the part of the City to show deliberate indifference towards the inadequate training of its police officers. *See Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

by definition, acted reasonably. Accordingly, plaintiff's claims for intentional infliction of emotional distress or outrageous conduct must be dismissed.

Finally, the plaintiff alleges that Lt. Echols is liable to her for the state law torts of negligence and gross negligence. Under the Pennsylvania Political Subdivision Tort Claims Act, 42 PA. CONS. STAT. §§ 8541 *et seq.*, municipal employees are immune from suits in negligence when the allegedly negligent conduct occurred within the scope of the employee's office or duties. 42 PA. CONS. STAT. §§ 8541 & 8545; *see Moser v. Bascelli,* 865 F.Supp. 249, 253 (E.D.Pa.1994); *Cooper v. City of Chester,* 810 F.Supp. 618, 625 (E.D.Pa.1992). In this case, it is uncontested that while the allegedly negligent conduct occurred, Lt. Echols was acting within the scope of his office and duties. Accordingly, plaintiff's claims for negligence and gross negligence on the part of defendant Echols cannot succeed, and summary judgment will be entered in favor of defendants as to Count III.[16]

## IV. CONCLUSION

Based on the foregoing analysis, the court concludes, that summary judgment shall be granted in favor of the defendants and against the plaintiff on all counts.

An appropriate order follows.

### *ORDER*

**AND NOW,** on this **28th** day of **January, 2003,** upon consideration of defendants' motion for summary judgment (doc. no. 16) and all responses and replies thereto, it is hereby **ORDERED** that the motion is **GRANTED.**

It is **FURTHER ORDERED** that defendants motion for enlargement of time (doc. no. 14) is **GRANTED.**

### AND IT IS SO ORDERED.

### *JUDGMENT*

**AND NOW,** on this **28th** day of **January, 2003,** upon consideration of the order of the court dated January 28, 2003, judgment is entered in favor of the defendants and against the plaintiffs.

### AND IT IS SO ORDERED.

---

**16.** In Count IV of the complaint, plaintiff's husband asserts a cause of action for loss of consortium. Having found in favor of the defendants with regards to all other counts, the court must, likewise, grant summary judgment in favor of the defendants with regards to Count IV.